814 F.2d 1127
 Fed. Sec. L. Rep. P 93,012, Fed. Sec. L. Rep. P 93,243,
8 Employee Benefits Ca 1593,
8 Employee Benefits Ca 1605
Beverly J. OTTO, individually, and on behalf of all others
similarly situated, Plaintiff-Appellant,
v.
VARIABLE ANNUITY LIFE INSURANCE COMPANY, et al., Defendants-Appellees.
 Nos. 85-1816, 85-1919 and 85-2410.
 United States Court of Appeals,
Seventh Circuit.
 Argued May 15, 1986.
Decided Dec. 8, 1986.
As Amended Dec. 10, 1986.
Opinion on Rehearing April 15, 1987.
As Amended June 10, 1987.
Rehearing En Banc Denied June 15, 1987.
 
 Craig E. Anderson, Lowell H. Jacobson, Jacobson, Brandvik & Anderson, Herbert I. Rothbart, Allen D. Choka (of counsel), Chicago, Ill., for plaintiff-appellant.
 Randall L. Mitchell, Adams, Fox, Adelstein & Rosen, Chicago, Ill., for defendants-appellees.
 Before BAUER, Chief Judge, and CUDAHY and RIPPLE, Circuit Judges.
 CUDAHY, Circuit Judge.
 
 
 1
 The named plaintiff, Beverly J. Otto, brought this class action against Variable Annuity Life Insurance Company ("VALIC"), the Variable Annuity Marketing Company ("VAMCO"), a wholly-owned subsidiary of VALIC, certain other affiliated companies, and individual officers and directors of the corporate defendants. Otto alleged violations of the Securities Exchange Act of 1934 (the "1934 Securities Act"), 15 U.S.C.A. Sec. 78a et seq. (West 1981 & Supp.1986), the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. Secs. 1001-1461 (West 1985 & Supp.1986), and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C.A. Secs. 1961-1968 (West 1984 & Supp.1986). Otto also alleged conspiracy, breach of contract and common law fraud. The district court granted the defendants' motion for summary judgment on the Securities Act and ERISA claims, dismissed the RICO and conspiracy claims for failure to state a claim upon which relief could be granted, and dismissed the state law claims of breach of contract and common law fraud for lack of jurisdiction. 611 F.Supp. 83. The court refused to reconsider its order or permit Otto to file an amended complaint. 107 F.R.D. 635. We affirm the judgment of the district court, except that we reverse the judgment with respect to the dismissal of the claims of conspiracy to violate ERISA and the 1934 Securities Act and instead grant the defendants' motion for summary judgment on those claims.
 
 I.
 
 2
 VALIC is in the business of selling, among other things, certain annuities which qualify for tax-exempt status under section 403(b) of the Internal Revenue Code. Typically, VALIC enters into a "group unit purchase contract" with a tax-exempt organization such as a public school or college under which the organization permits VALIC to offer its various annuity plans to the organization's employees. If an employee chooses to participate in one of VALIC's plans, he or she directs the employer to contribute a portion of the employee's salary (up to a statutorily prescribed maximum) to purchase an annuity.
 
 
 3
 VALIC offers participating employees two types of annuity contracts: the fixed annuity and the variable annuity. Under both plans, the principal and any return accumulate during the life of the contract. At the end of the contract, the employee may withdraw the accumulated monies or use them to purchase an annuity from VALIC.
 
 
 4
 Under the fixed annuity, VALIC guarantees the principal and an interest rate of 4 percent per year for the first ten years and 3 1/2 percent thereafter. "Excess" interest over the guaranteed rate is paid to fixed annuity participants at the discretion of VALIC. Funds are held in VALIC's unsegregated general account and are invested primarily in long-term debt-type instruments such as mortgages and bonds.
 
 
 5
 Under the variable annuity, neither the principal nor the rate of return is guaranteed; both fluctuate with VALIC's investment performance. Funds are placed in what is known as a Separate Account, an account segregated from VALIC's general assets. The Separate Account's funds are invested in a diversified portfolio of common stocks and other equity-type investments.
 
 
 6
 Otto purchased a fixed annuity from VALIC in 1975. On August 2, 1982, she brought this class action on behalf of herself and all Illinois investors who participated in VALIC's fixed annuity plan between October 17, 1975 and August 2, 1982. Otto claims that VALIC failed to disclose the manner in which interest was calculated under the fixed annuity plan--specifically, that it used the "banding" or "new money" method for crediting "excess" interest to the fixed annuity account. Under the banding method, the current rate of excess interest is paid only on deposits made during the current period. All prior contributions continue to earn the rates of excess interest declared during the periods in which those contributions were made. Otto also claims that the defendants failed to disclose the method by which a participant in the fixed annuity plan could maximize his or her rate of return. According to Otto, an employee could earn the current rate of interest by transferring funds from the fixed account into a variable account for 120 days and then transferring them back into the fixed account. In Counts I, II and III of her amended complaint, Otto contends that the defendants' nondisclosure constitutes a violation of the 1934 Securities Act, a breach of their fiduciary duty under ERISA, and a violation of section 1962(c) of RICO. She alleges in Count IV that the defendants conspired to violate the 1934 Securities Act, ERISA and RICO. Counts V and VI allege breach of contract and common law fraud.
 
 
 7
 The defendants filed a motion to strike and dismiss Otto's amended complaint and for summary judgment. The district court granted summary judgment on the 1934 Securities Act and ERISA counts, finding these laws to be inapplicable because VALIC's fixed annuity did not constitute a security within the meaning of the federal securities laws or an employee benefit plan within the meaning of ERISA. The court dismissed the RICO count on the grounds that the complaint failed to specify an enterprise and each defendant's role in the alleged pattern of racketeering activity proscribed by that statute. The conspiracy count was dismissed for failure to allege any facts in support of such a claim. With the dismissal of these federal claims which had furnished the basis of pendent jurisdiction, the court dismissed the contract and common law fraud claims.[1]
 
 II.
 
 8
 Section 3(a)(8) of the Securities Act of 1933 exempts from its provisions "[a]ny insurance or endowment policy or annuity contract or optional annuity contract" issued by a corporation subject to supervision by the appropriate insurance regulatory authority. 15 U.S.C. Sec. 77c(a)(8) (1982). The issue before us is whether the fixed annuity plan sold by VALIC is an "annuity" under section 3(a)(8) or whether the plan is an "investment contract" subject to the requirements of the 1934 Securities Act. The district court held that VALIC's fixed annuity was more properly viewed as an insurance product than as an investment contract. Because we agree with the district court's determination that the annuity in question falls within the section 3(a)(8) exemption, we hold that the district court properly granted summary judgment on the 1934 Securities Act claim.
 
 
 9
 In S.E.C. v. Variable Annuity Life Insurance Co. ("VALIC "), 359 U.S. 65, 79 S.Ct. 618, 3 L.Ed.2d 640 (1959), the Supreme Court considered whether a variable annuity was a security or insurance. The Court discussed the characteristics distinguishing the variable annuity from the traditional fixed annuity. Generally, the funds underlying the fixed annuity are invested according to conservative standards, and the fixed annuity pays a specified and definite amount to the annuitant. In contrast, the variable annuity's funds are invested primarily in common stocks and other equities, and the variable annuity's benefits vary with the success of the company's investment experience. The holder of a variable annuity, therefore, is not able to depend upon the annuity's paying a fixed return. Id. at 69-70, 79 S.Ct. at 620-21. The insurance company in VALIC stressed the fact that, as with all insurance, the company assumed the mortality risks under both the variable and the fixed annuity plans. Yet the Court found this characteristic alone an insufficient basis for considering a variable annuity to be insurance. Insurance, according to the Court, "involves some investment risk-taking on the part of the company" and "a guarantee that at least some fraction of the benefits will be payable in fixed amounts." Id. at 71, 79 S.Ct. at 622. An annuity contract that did not guarantee a fixed return thus places all of the investment risk on the policyholder and none on the company. Because there was "no true underwriting of risks," id. at 73, 79 S.Ct. at 623, the VALIC Court concluded that the variable annuity was a security.
 
 
 10
 In S.E.C. v. United Benefit Life Insurance Co., 387 U.S. 202, 87 S.Ct. 1557, 18 L.Ed.2d 673 (1967), the Court again explored the distinction between a security and insurance in considering a deferred, or optional, annuity plan. Under this "Flexible Fund" annuity program, the purchaser's premiums less a deduction for expenses (the net premium), and any money earned from investing the premiums, were held in a Flexible Fund Account, which United maintained separately from its other funds. The purchaser was entitled to withdraw the "cash value" of the policy before maturity. The "cash value" was equal to the higher of two amounts: the purchaser's proportional share of the fund or the "net premium guarantee," which was measured by a gradually increasing percentage of the purchaser's net premiums, from fifty percent of net premiums in the first year to one hundred percent after ten years. At maturity, the purchaser had the option of either receiving the cash value of the policy or converting that interest into a life annuity. Although the dollar amount of the fixed payments under the life annuity varied with the cash value of the policy, the net premium guarantee ensured that a minimum annuity would be available at maturity. Id. at 205-06, 87 S.Ct. at 1558-59.
 
 
 11
 The Court assessed the Flexible Fund portion of the contract independently from the annuity portion of the contract and concluded that the Flexible Fund contract did not fall within the insurance exemption of the federal securities laws. The test to determine whether an instrument is an investment contract, according to the Court, "is what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect." Id. at 211, 87 S.Ct. at 1562 (quoting S.E.C. v. C.M. Joiner Leasing Corp., 320 U.S. 344, 352-53, 64 S.Ct. 120, 124, 88 L.Ed. 88 (1943)). The Court noted that the Flexible Fund completely reversed the role of the insurer during the accumulation period. Instead of offering the inducements typical for insurance, such as "stability" and "security," United proposed to serve as an investment agency and promised the policyholder "growth." Id. at 211, 87 S.Ct. at 1562. At maturity, the insurer was obligated to produce only the guaranteed minimum, an amount "substantially less than that guaranteed by the same premiums in a conventional deferred annuity contract." Id. at 208, 87 S.Ct. at 1560. Although the minimum guarantee "substantially" reduced the investment risk of the purchaser, the Court pointed out that there was a "basic difference between a contract which to some degree is insured and a contract of insurance." Id. at 211, 87 S.Ct. at 1562. The Court found the minimum guaranteed in United Benefit to be so low that the risk to the insurance company was insignificant.
 
 
 12
 This court considered whether a "group deposit administration annuity contract" constituted a security or insurance in Peoria Union Stock Yards Co. v. Penn Mutual Life Insurance Co., 698 F.2d 320 (7th Cir.1983). Under the contract at issue in Peoria Union, the employer contributed annually to a deposit account at Penn Mutual to fund a defined-benefit retirement plan for its employees. When an employee retired, the employer could purchase the annuity from the insurance company with a portion of the funds on deposit or it could withdraw funds and purchase the annuity for its employee from another insurance company. Id. at 321. The income available to fund the employer's obligations to its employees for the fixed benefit annuity fluctuated with the investment experience of Penn Mutual. Penn Mutual guaranteed interest on the employer's contributions made during the first three years of the contract at a rate declining from 7 1/2 percent the first year to 3 1/2 percent the third year. Although there was no guarantee of interest after the first three years, any interest earned by the deposit account beyond the interest guarantee was required to be credited to the deposit account. Id. at 322. It is unclear from the opinion whether or not the funds for these contracts were held by Penn Mutual in a separate account segregated from its general assets.
 
 
 13
 This court observed that the contract in Peoria Union was similar to the deferred annuity contract in United Benefit in that the insurance company actually served as an investment agency and permitted the pension plan to share in the company's investment experience. Id. at 325. Moreover, in both cases, the insurance company guaranteed a minimum return so low as to place the investment risk on the investor rather than on the insurance company. Id. Based on these characteristics of the plan, the court concluded that during the accumulation phase the annuity plan was an investment contract.
 
 
 14
 Unlike the plans evaluated in Peoria Union, United Benefit, and VALIC, the defendant VALIC's fixed annuity plan in the present case appealed to potential participants on the usual insurance bases of stability and security. VALIC promoted the fixed annuity as a long-term accumulation of funds for retirement through compound interest. Contributions were mingled with the company's general assets and invested primarily in debt-type securities. Regardless of the investment success of VALIC's general account, VALIC was required to pay a guaranteed rate of interest on all fixed annuity contributions of 4 percent during the first ten years and 3 1/2 percent thereafter. Although this was a low rate of return, it was not so low that we can say it placed the investment risk on the policyholder in a way substantial enough to make the fixed annuity a security. VALIC advertised that, although the earning power of the participant in the fixed plan might not be as great as anticipated due to inflation, the participant had the peace of mind that the investment was guaranteed regardless of economic conditions. Although VALIC boasted that the company's funds were managed by experienced and trained investment managers, as we stated in Peoria Union, investment management is the "life blood" of life insurance companies, Peoria Union, 698 F.2d at 322, and thus it was not inappropriate for VALIC to tout its investment experience even in relation to an insurance product. The difference between the plan before us and the one considered in Peoria Union is not enormous, but the balance of the investment risk has been sufficiently shifted to the insurance company to justify a different result here.
 
 
 15
 In addition, that VALIC promoted its fixed annuity as insurance is especially apparent when contrasted with its promotion of its variable annuity. VALIC advertised its variable annuity as having a principal objective of long-term capital growth of tax-deferred investments. The contributions of all participants in the variable annuity were held together in a Separate Account, segregated from VALIC's other investments. This Separate Account was invested in common stocks and other equity-type investments. The value of the variable annuity varied with the investment results of the stocks held in the portfolio. VALIC emphasized in its literature that a significant difference between the fixed and the variable annuity was that VALIC assumed the investment risk for the fixed annuity to the extent of guaranteeing minimum fixed rates of compound interest and providing for excess interest credits. The fixed annuity, however, was not intended as a hedge against inflation or the depreciation of the dollar. Such protection was purportedly afforded by the variable annuity plan for participants willing to accept investment risks.
 
 
 16
 Our view that VALIC's fixed annuity does not constitute a security is supported by the Securities and Exchange Commission's recent issuance of Rule 151, which establishes a "safe harbor" for certain types of annuity contracts by guaranteeing them exemption from the federal securities laws. 51 Fed.Reg. 20,262 (1986). If a contract complies with the requirements of Rule 151, it is deemed to be an "annuity contract or optional annuity contract" under section 3(a)(8) of the 1933 Securities Act and thus exempt from the provisions of the federal securities laws.[2] Although Rule 151 is not applicable in this case because its effective date is subsequent to the sale in question, an examination of the Rule is nevertheless helpful in determining the scope of the section 3(a)(8) exclusion.
 
 Rule 151 provides:
 
 17
 (a) Any annuity contract or optional annuity contract (a "contract") shall be deemed to be within the provisions of section 3(a)(8) of the Securities Act of 1933 [15 U.S.C. 77c(a)(8) ], Provided, That
 
 
 18
 (1) The annuity or optional annuity contract is issued by a corporation (the "insurer") subject to the supervision of the insurance commissioner, bank commissioner, or any agency or officer performing like functions, of any State or Territory of the United States or the District of Columbia;
 
 
 19
 (2) The insurer assumes the investment risk under the contract as prescribed in paragraph (b) of this section; and
 
 
 20
 (3) The contract is not marketed primarily as an investment.
 
 
 21
 (b) The insurer shall be deemed to assume the investment risk under the contract if:
 
 
 22
 (1) The value of the contract does not vary according to the investment experience of a separate account;
 
 
 23
 (2) The insurer for the life of the contract
 
 
 24
 (i) Guarantees the principal amount of purchase payments and interest credited thereto, less any deduction (without regard to its timing) for sales, administrative or other expenses or charges; and
 
 
 25
 (ii) Credits a specified rate of interest (as defined in paragraph (c) of this section) to net purchase payments and interest credited thereto; and
 
 
 26
 (3) The insurer guarantees that the rate of any interest to be credited in excess of that described in paragraph (b)(2)(ii) of this section will not be modified more frequently than once per year.(c) The term "specified rate of interest," as used in paragraph (b)(2)(ii) of this section, means a rate of interest under the contract that is at least equal to the minimum rate required to be credited by the relevant nonforfeiture law in the jurisdiction in which the contract is issued. If that jurisdiction does not have any applicable nonforfeiture law at the time the contract is issued (or if the minimum rate applicable to an existing contract is no longer mandated in that jurisdiction), the specified rate under the contract must at least be equal to the minimum rate then required for individual annuity contracts by the NAIC Standard Nonforfeiture Law.
 
 
 27
 51 Fed.Reg. 20,262 (1986).
 
 
 28
 VALIC's fixed annuity satisfies all of the requirements of Rule 151. VALIC, the insurer, is subject to the insurance laws of Texas and to regulation by the Texas Commissioner of Insurance, as well as to the insurance laws and regulations of all states in which it is licensed to do business, thereby satisfying the first prong, subsection (a)(1), of Rule 151. VALIC's fixed annuity also fulfills the requirement under the second prong, subsection (a)(2), that the insurer assume the investment risk. Contributions are not invested in a separate account and therefore the value of the contract is not tied to the investment experience of such an account. See Rule 151(b)(1). VALIC guarantees that a participant will receive the cash value of all premiums and a specified rate of interest of 4 percent for the first ten years and 3 1/2 percent thereafter. These specified rates of interest are more than the 3 percent minimum rate required under the Rule.[3] See Rule 151(b)(2)(ii). Under subsection (b)(3), the insurer must guarantee that its rate of excess interest will not be modified more than once per year. Although VALIC does not guarantee that it will leave the excess interest rate unchanged for a year, it does use the "banding" method of computing interest. Under this method, VALIC in effect guarantees the excess interest rate on every deposit for the life of the annuity contract. In its discussion of Rule 151 that was released with the rule's enactment, the SEC made clear that it considered the banding method, or in the SEC's words, the "payment basis" of computing interest, as satisfying this second requirement of Rule 151.[4] Finally, the Rule requires under its third prong, subsection (a)(3), that the contract not be marketed primarily as an investment. Although the award of discretionary excess interest and VALIC's investment experience were given some emphasis, the fixed annuity, as discussed above, was marketed primarily on the basis of its stability and security.
 
 III.
 
 29
 Otto argues that the district court erroneously granted summary judgment for the defendants on her ERISA count. The district court found that the annuity plan was not maintained or established by Otto's employer and thus was not subject to the provisions of ERISA. Under ERISA, "the terms 'employee pension benefit plan' and 'pension plan' mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both...." 29 U.S.C. Sec. 1002(2)(A) (1982) (Emphasis added). Otto's employer's sole involvement with the annuity plan was to permit VALIC, along with various other companies, to present benefit plans to its employees and, if a VALIC plan was chosen by the employee, to collect the contributions for the plan from the employee and remit them to VALIC. Otto herself emphasized in the district court that the plans sold by VALIC were not established or maintained by a school district or any other governmental agency; rather, the VALIC contracts were "established and maintained only by VALIC." Record, Document 142 (hereinafter R. 142) at 4.[5] Otto nevertheless maintained that the VALIC plan was covered by ERISA because the employer "entered into what may be called an enabling contract with VALIC whereby VALIC may provide investment annuities to the employers." R. 131, at 31-32.
 
 
 30
 The Department of Labor has promulgated a regulation defining the phrase "established and maintained by an employer" as that phrase is used in ERISA. Under 29 C.F.R. Sec. 2510.3-2(f) (1985), a program for the purchase of an annuity or the establishment of a custodial account shall not be deemed to be established or maintained by an employer within the meaning of ERISA when (among other factors not relevant here) the sole involvement of the employer is to permit annuity contractors to offer their products to employees and collect and remit payment and maintain records of such payments. The construction by the Department of Labor, which is entrusted with the enforcement of ERISA, is entitled to considerable weight. Abella v. W.A. Foote Memorial Hospital, 740 F.2d 4, 5 (6th Cir.1984). See also Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944). We therefore agree with the district court's finding that in the named plaintiff's case the "minimal, ministerial activities [performed by plaintiff's employer] do not render VALIC's fixed annuity plan one 'established or maintained' by the school district." 611 F.Supp. 83, 88 (N.D.Ill.1985).
 
 
 31
 Otto argues that the Secretary of the Department of Labor exceeded his authority in enacting this regulation. Under 29 U.S.C. Sec. 1135 (1982), the Secretary may "prescribe such regulations as he finds necessary or appropriate to carry out the provisions of [ERISA]." Thus, the Secretary did not exceed his authority in promulgating Section 2510.3-2(f) defining the phrase "established or maintained by an employer" as used in ERISA.[6]
 
 
 32
 Otto argues on appeal, however, that the district court erroneously based its decision to grant summary judgment on the ERISA claim against the entire plaintiff class solely on the facts that applied to the named plaintiff and ignored whatever facts existed concerning the other class members. On appeal, Otto suggests for the first time that the description of the plan set forth by her and relied on by the district court in granting summary judgment "may be unique to Otto." Appellant's Brief at 30. Yet Otto has never before argued that the administration of VALIC's fixed annuity plan differs among employers in any way that would render the plan "established or maintained by an employer." Throughout her pleadings in the court below, and even in her brief submitted to this court, she has described the role played by the employer pursuant to the plan as being the same across employers.[7] Otto may not offer on appeal arguments against summary judgment that were not raised before the trial court.[8]
 
 IV.
 
 33
 Otto claims that the district court erred in dismissing the RICO count. To allege a violation under section 1962(c) of RICO, a plaintiff must allege that the defendant "(1) was employed by or associated with (2) an enterprise engaged in, or the activities of which affected, interstate or foreign commerce, and (3) that the person conducted or participated in the conduct of the enterprise's affairs (4) through a pattern of racketeering activity." Haroco, Inc. v. American National Bank & Trust Co., 747 F.2d 384, 387 (7th Cir.1984), aff'd, 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985). The district court dismissed the RICO count because it failed to identify the enterprise and each defendant's role in the pattern of racketeering activity.
 
 
 34
 We affirm the dismissal of the RICO count for failure to identify the enterprise. Otto concedes that she did not identify the enterprise but argues that she was not required to do so because it was "obvious" that VAMCO was the enterprise.[9] Yet in responding in the district court to the defendants' motion to dismiss for failure to identify the enterprise, Otto suggested that the enterprise here could be "a structural business entity such as VALIC itself, VAMCO, or a board of directors such as the individual defendants, [or] ... associations in fact, though not a legal entity." R. 131, at 37. Otto's own words reveal that the enterprise was far from "obvious" in her amended complaint.
 
 
 35
 We therefore do not have to reach the district court's finding that Otto failed to plead with the specificity required by Federal Rule of Civil Procedure 9(b) each defendant's involvement in the fraudulent activity. We note, however, that our finding in Haroco that the civil RICO claim made there met the specificity requirements of Rule 9(b) also apparently describes Otto's RICO claim in the present case:[T]he complaint adequately specified the transactions, the content of the allegedly false representations, and the identities of those involved. In addition, the identification of the transactions and the description of the alleged scheme to defraud put defendants on fair notice of the time and place of the alleged false representations.
 
 
 36
 747 F.2d at 405.
 
 V.
 
 37
 Otto claims further that all of the defendants conspired to violate RICO, ERISA and the 1934 Securities Act. The district court dismissed the conspiracy count for failure to state a claim but did not rule on the defendants' motion for summary judgment on the conspiracy claim. We affirm the dismissal of the claim alleging conspiracy to violate RICO. We reverse, however, the dismissal of the claims of conspiracy to violate ERISA and the 1934 Securities Act and find that the district court instead should have granted the defendants' motion for summary judgment on those claims.
 
 
 38
 To state a claim for conspiracy, a plaintiff must allege the agreement of each defendant to the operation of the conspiracy. See United States v. Neapolitan, 791 F.2d 489, 496 (7th Cir.1986); Thornton v. Evans, 692 F.2d 1064 (7th Cir.1982). A complaint may be dismissed if it contains only conclusory, vague and general allegations of conspiracy. Fullman v. Graddick, 739 F.2d 553, 557 (11th Cir.1984). In dismissing the conspiracy count, the district court stated that "[t]here are simply no facts alleged which permit a reasonable inference that the dozens of defendants, many of whom were no longer affiliated with VALIC when other defendants began their association with the company, ever assented to a conspiracy to violate various federal laws." 611 F.Supp. at 90 (N.D.Ill.1985) (emphasis in original). We disagree with this characterization of Otto's complaint. In her complaint, Otto alleged that each of the defendants agreed and conspired to violate RICO, ERISA and the 1934 Securities Act; she identified each defendant's specific position with the corporation at the time of the alleged conspiracy; and she alleged several overt acts committed by the defendants in furtherance of the conspiracy. We believe that Otto has stated a claim for conspiracy to violate ERISA and the 1934 Securities Act.
 
 
 39
 However, Otto's claim for conspiracy to violate RICO fails for the same reason her RICO claim failed, that is, she did not identify a RICO enterprise. This circuit has stated that it is the existence of an enterprise that distinguishes a RICO conspiracy from other conspiracies. Neapolitan, 791 F.2d at 499-50.[10] A RICO conspiracy claim cannot stand absent an allegation of the involvement of an enterprise. We therefore affirm the dismissal of Otto's claim of conspiracy to violate RICO.
 
 
 40
 After dismissing the defendants' conspiracy count, the district court did not reach their motion for summary judgment on this count. In light of our affirmance of the district court's grant of summary judgment on the 1934 Securities Act and ERISA claims, the defendants clearly were also entitled to summary judgment on the claim of conspiracy to violate those statutes. Otto bases her conspiracy claim almost entirely on her allegations of violations of the underlying statutes. Because we have held those statutes inapplicable to VALIC's fixed annuity plan, there exists no genuine dispute as to whether the defendants conspired to violate them through the promotion of the plan.
 
 
 41
 A remaining question is whether this court should itself grant the defendants' motion for summary judgment or remand this issue to the district court. The parties have had a full and fair opportunity to argue all relevant aspects of the summary judgment issue, both pursuant to the defendants' summary judgment motion in the district court and in connection with the 1934 Securities Act and ERISA claims before this court. The correct resolution of this issue is clear. Because there is nothing to be gained from a remand, and in the interest of judicial economy, we hold that the defendants are entitled to summary judgment on Otto's claim of conspiracy to violate ERISA and the 1934 Securities Act.[11]
 
 VI.
 
 42
 In response to the defendants' motion for summary judgment, Otto filed a motion pursuant to Federal Rule of Civil Procedure 56(f) asking for a continuance of the hearing on the defendants' motion and for an opportunity to conduct further discovery. The magistrate, in an opinion adopted by the district court, denied this motion. Otto argues that the district court abused its discretion in denying her motion.[12]
 
 
 43
 Summary judgment is proper if the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Thus, if, after adequate time for discovery and upon motion, a party fails to make a showing of a genuine issue of material fact, summary judgment is appropriate. Celotex Corp. v. Catrett, --- U.S. ----, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Rule 56(f) permits a party who has no specific evidence contradicting an opponent's motion for summary judgment to survive the motion by both presenting valid reasons for the lack of proof and showing how postponement of a ruling will enable the non-movant to rebut the movant's showing. Gieringer v. Silverman, 731 F.2d 1272, 1280 (7th Cir.1984); Korf v. Ball State University, 726 F.2d 1222, 1230 (7th Cir.1984). A district court's ruling on a Rule 56(f) motion may be reversed only for an abuse of discretion. See Korf, 726 F.2d at 1231.
 
 
 44
 The magistrate denied additional discovery because plaintiff's Rule 56(f) motion failed to demonstrate a need for further discovery. The defendants' motion for summary judgment was based upon admissions of the plaintiff, documents she had attached to her complaint, and the affidavits of two VALIC employees. The affidavits of the VALIC employees vouched for facts which Otto either already knew or about which she could readily determine whether a dispute existed. Otto did not adequately explain why she was unable to respond to defendants' motion. She merely made the general assertion that she needed an opportunity for additional discovery to respond to the allegations. Otto claimed that discovery had been deferred until after the class had been certified. Any deferral of discovery, however, was due to plaintiff's lack of diligence rather than to a court order. Moreover, Otto failed to indicate how production of the documents she sought would have assisted her in resisting summary judgment. The district court's refusal to grant a continuance for additional discovery was not an abuse of discretion.
 
 VII.
 
 45
 Otto argues that the court erred in denying her post-trial motions requesting leave to file a second amended complaint. On April 19, 1985, Otto filed a motion to reconsider and for leave to file a second amended complaint. On April 26, 1985, the court denied Otto's request because she failed to attach a second amended complaint to her motion or inform the court how she planned to cure the deficiencies of the first amended complaint. Otto filed a second motion to reconsider and for leave to amend on May 10, 1985. Although she submitted a second amended complaint with her second motion to reconsider, the court found that Otto's motion to reconsider was untimely and that amendment would be futile.
 
 
 46
 Following an entry of judgment on the dismissal of a complaint by a district court, a plaintiff may amend the complaint under Federal Rule of Civil Procedure 15(a) only after the judgment has been set aside or vacated pursuant to a motion under Rule 59(e) or Rule 60(b) and leave of court to amend has been granted. Twohy v. First National Bank, 758 F.2d 1185, 1196 (7th Cir.1985); Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1111-12 (7th Cir.1984), cert. denied, 470 U.S. 1054, 105 S.Ct. 1758, 84 L.Ed.2d 821 (1985). Although leave to amend shall be freely given when justice so requires, Fed.R.Civ.P. 15(a), the decision to allow amendment after dismissal lies within the sound discretion of the trial court. A motion to amend should state with particularity the grounds for the motion and should be accompanied by the proposed amendment. 3 J. Moore, Moore's Federal Practice p 15.12, at 15-115 (2d ed. 1984). Failure to tender an amended complaint with a Rule 59(e) motion may indicate a lack of diligence and good faith. Twohy, 758 F.2d at 1197; see also Verhein v. South Bend Lathe, Inc., 598 F.2d 1061, 1063 (7th Cir.1979) (per curiam) (court may properly refuse request to amend where moving party has not shown proposed amendment has substantial merit).
 
 
 47
 Otto failed to tender a second amended complaint with her first Rule 59(e) motion. She also failed to explain why a second amended complaint was not filed with the motion. She did not indicate how she planned to cure the deficiencies that resulted in the dismissal of the amended complaint. Rather, she merely stated that she would respond to the defendants' first motions attacking the complaint. Under these circumstances, we cannot say that the trial judge abused his discretion in denying Otto's motion to amend.
 
 
 48
 The district court construed Otto's second motion to reconsider and for leave to amend as another Rule 59(e) motion and denied the motion as untimely. A motion under Rule 59(e) must be brought within ten days after the entry of judgment. Otto filed her second motion to reconsider twenty-nine days after the court's dismissal of the action and fourteen days after its denial of her first motion to reconsider. Thus, to the extent that the motion may be construed as one brought under Rule 59(e), the district court was correct in denying the motion as untimely.
 
 
 49
 Otto, on appeal, states that the second motion to reconsider was brought under Rule 60(b), which allows relief from judgment for, among other things, mistake, inadvertence, excusable neglect, newly discovered evidence and fraud.[13] She, however, does not point to a specific permissible reason under 60(b) which applies to this case. In her second motion to reconsider, Otto explained why a second amended complaint had not accompanied her first motion to reconsider and how the attached second amended complaint corrected the deficiencies of the first amended complaint. In addition, she argued the merits of the court's order dismissing the action. We agree with the district court that Otto's request was for the court to amend its judgment by correcting errors of law under Rule 59(e) rather than for relief from judgment for any reason allowed under Rule 60(b). Accordingly, the district court's refusal to reopen the judgment was not an abuse of discretion. Because Otto was not successful in reopening the judgment, her motion for leave to amend was a nullity and the decision of the district court denying leave to amend was correct. See Car Carriers, 745 F.2d at 1112.
 
 
 50
 AFFIRMED.
 
 OPINION ON REHEARING
 
 51
 CUDAHY, Circuit Judge.
 
 
 52
 Following the issuance of our opinion in this case, the defendant, Variable Annuity Life Insurance Company "VALIC", filed a motion to modify the opinion, and the plaintiff, Otto, filed a petition for rehearing. In its motion to modify the opinion, VALIC for the first time informed this court that it claimed to have the right to alter, at its unfettered discretion, the interest "bands" paid on past contributions. Earlier, both before the district court and this court, VALIC had claimed only that it had the discretion to declare the excess interest rate to be paid on new deposits. VALIC emphasized that these discretionary changes in the excess interest rate affected only current deposits and that past deposits would continue to earn the interest rate in effect at the time the deposit was made:
 
 
 53
 Like virtually all of its competitors at that time, VALIC employed the "new money" or "banding" method for crediting excess interest to the fixed annuity account; i.e., the excess interest rate set by the Board of Directors was paid on deposits made during that particular period. Subsequent fluctuations in the excess rate did not affect a participant's past contributions. Each deposit stayed in its "band," and continued to draw interest at the rate in effect when the deposit was made.
 
 
 54
 Defendants' Brief at 4-5 (footnote omitted). VALIC made similar representations in its literature soliciting participants for its fixed annuity plan. A formal written proposal, which VALIC said was sent to "virtually all, if not all, prospective customers" in the Midwest Region during the years 1979 to 1983, contained the following question and answer:
 
 
 55
 Describe the basis for the dividends or current interest rate illustrated above.
 
 
 56
 The current rate of interest is composed of the guaranteed interest rate plus "excess interest." Excess interest is declared and guaranteed for deposits received in the Fixed Account on a calendar quarter basis by the Board of Directors of VALIC. Excess interest is computed daily and credited on amounts remaining in a participant's Fixed Account at the end of each calendar quarter.
 
 
 57
 VALIC employs the new money method for crediting excess interest. The current interest rate is paid on monies for the period in which it is in effect. Should the current interest rate change (i.e., up or down), it would not affect a participant's past contributions but only those contributions deposited while the new rate is in effect. A change in the current rate would in no way affect the past accumulations in a participant's account balance.
 
 
 58
 Defendants' Memorandum in Opposition to Plaintiff's Motion for Class Certification, Exhibit C (emphasis added). Based on repeated statements such as this made by VALIC coupled with VALIC's failure to assert the right to alter past bands, this court concluded that the interest bands were guaranteed for the life of the contract.
 
 
 59
 We will accept solely for the purposes of this rehearing VALIC's assertion that it had the right to change at any time the interest bands paid on past deposits. The question then becomes what effect does this new fact have on our determination that the fixed annuity was an insurance product rather than a security and therefore not subject to federal securities laws. Not surprisingly, VALIC argues that the soundness of our prior determination is unaffected. VALIC suggests that we merely delete from our opinion the following sentence: "Under this method, VALIC in effect guarantees the excess interest rate on every deposit for the life of the annuity contract." Supra, at 1134. Otto, on the other hand, argues that the correctness of that sentence is crucial to the opinion's determination that the fixed annuity is not a security but an insurance product. Otto requests, both in its response to VALIC's motion and in its petition for rehearing, that we withdraw our entire discussion of this issue and find instead that the fixed annuity is a security. We agree with Otto that we cannot simply delete the sentence and leave the remainder of the discussion untouched. We therefore supplement section II of our prior opinion with this opinion. Upon reexamination in light of VALIC's newly asserted right to alter past interest bands, we hold that VALIC's fixed annuity plan is a security subject to the federal securities laws.
 
 
 60
 The amount of discretion retained by VALIC to alter the interest it paid under the fixed annuity is relevant to the level of the investment risk assumed by VALIC. As discussed in our previous opinion, the Supreme Court, this circuit and the Securities and Exchange Commission (the "SEC") all have found that the degree of investment risk assumed by the insurance company is an important factor in determining whether a particular annuity plan is an insurance product or a security. The Supreme Court has stated that insurance "involves some investment risk-taking on the part of the company" and "a guarantee that at least some fraction of the benefits will be payable in fixed amounts." S.E.C. v. Variable Annuity Life Ins. Co., 359 U.S. 65, 71, 79 S.Ct. 618, 622, 3 L.Ed.2d 640 (1959). The Court has also noted that there is "a basic difference between a contract which to some degree is insured and a contract of insurance." S.E.C. v. United Benefit Life Ins. Co., 387 U.S. 202, 211, 87 S.Ct. 1557, 1562, 18 L.Ed.2d 673 (1967); see also Peoria Union Stock Yards Co. Retirement Plan v. Penn Mutual Life Insurance Co., 698 F.2d 320 (7th Cir.1983). The SEC recently enacted Rule 151 which defines more precisely what constitutes sufficient investment risk-taking by an insurance company to ensure that an annuity will be considered an insurance product and exempt from the federal securities laws pursuant to section 3(a)(8) of the 1933 Securities Act. VALIC itself relied on the then proposed Rule 151 in its initial brief before this court. VALIC argued that "[a]lthough the Rule, even if adopted, would not apply to the product sold (between 1975 and 1982) to Otto and other class members, the ... fixed annuity nonetheless largely satisfies the requirements contained in the proposed Rule...." Defendants' Brief at 17.
 
 
 61
 The second of the three prongs of Rule 151 requires that "[t]he insurer assumes the investment risk under the contract" as further defined in the rule. In order for the insurer to be "deemed to assume the investment risk" under the rule, the insurer must, among other things, "guarantee[ ] that the rate of any interest to be credited in excess of [the guaranteed minimum] ... will not be modified more frequently than once per year." In its brief on rehearing, VALIC concedes that the fixed annuity does not satisfy this requirement given VALIC's claimed right to alter past interest bands. VALIC asserts that it has the absolute right to stop all excess interest payments on all deposits, past or present: "[E]xcess interest is wholly discretionary; with its unfettered discretion, VALIC can calculate excess interest by any method it chooses, it can elect to change the current interest rate paid on deposits, it can change the rates on past contributions, and (although competition makes it unlikely) it can stop paying excess interest altogether--at any time." Defendants' Brief on Rehearing at 8 (footnote omitted). A claimed right to change established excess interest rates and to eliminate excess interest payments entirely at any time surely tends to shift the investment risk from VALIC to the plan participant. VALIC, however, argues that its failure to meet this requirement of Rule 151 does not require a change in our prior determination that the fixed annuity qualified for the 3(a)(8) exclusion. VALIC argues that our prior conclusion that VALIC bears a sufficiently substantial risk "is solidly based on the substantiality of the guaranteed rates, a fact entirely independent of the availability of discretionary excess interest." Id. at 9 (emphasis in original).
 
 
 62
 The SEC in adopting Rule 151 rejected VALIC's view that guaranteeing a low minimum interest rate is a sufficient assumption of the investment risk by the insurance company. In Securities Act Release No. 6645 in which the SEC offers guidance in interpreting Rule 151, the SEC notes that several commentators suggested that the requirement of a one-year excess interest guarantee be removed from the rule. The SEC rejected that suggestion and retained the one-year requirement, explaining its reasoning as follows:
 
 
 63
 While the commentators make some reasonable arguments, the Commission is adopting the one-year requirement as proposed. Taking the position that various types of excess interest contracts are entitled to rely on the section 3(a)(8) exclusion is itself a major step. The length of time between interest rate modifications is one legitimate measure of the degree of investment risk assumed by the insurer. Designing a "safe harbor" rule is essentially a matter of balancing the legitimate interests of flexibility in structuring insurance products against the need to provide adequate investor protection. Where the limits of the "safe harbor" are set is a matter of discretion and judgment. The Commission believe, therefore, that the one-year period is, on balance, a reasonable condition, complementing the two other components of the rule's investment risk test.
 
 
 64
 Definition of Annuity Contract, Discussion Accompanying Enactment of Rule 151, Securities Act Release No. 6645, Fed.Sec.L.Rep. (CCH) p 84,004, at 88,134 (May 29, 1986). We find that on the facts of this case the minimum interest rates guaranteed under VALIC's fixed annuity plan, although they are somewhat in excess of those required by Rule 151, alone do not place the investment risk on VALIC sufficiently to exempt the plan from the federal securities laws. To find otherwise we would have to overlook entirely any requirement for a guarantee of excess interest. To do this would be to disregard completely one element contained in the investment risk test of the SEC's safe harbor Rule 151. Admittedly this is not an element relied on previously in court decisions distinguishing securities from insurance products. But it is an element the SEC has insisted on over the objection of some commentators. Since Rule 151 was cited to us by VALIC as a relevant test, we are unwilling to ignore it to the degree urged by VALIC. We do not say that Rule 151 defines the meaning of "security"; it is a safe harbor rather than a definitional rule, as our first opinion observes, see supra at 1133 n.2. But VALIC's argument directly under the statute depends on its assertion that the guaranty of return here requires calling the instrument insurance under Sec. 3(a)(8) even if the prospect of "excess" interest is a principal inducement to purchase this particular instrument. Because the contract actually leaves the investor with an investment risk significant enough to throw its status into doubt, VALIC's argument in this court effectively depended on its own analogy to the standards of Rule 151, which has not sufficed.
 
 
 65
 REVERSED AND REMANDED.
 
 
 
 [1]
 Otto asserted in her brief and at oral argument that the district court improperly dismissed the state law claims with prejudice, thereby barring her from pursuing the claims in state court. We believe that Otto has misread the district court's opinion. The district court dismissed the state law claims on the ground that its disposition of the federal claims eliminated any basis for pendent jurisdiction. The court's citation of United Mineworkers v. Gibbs, 383 U.S. 715, 725-26, 86 S.Ct. 1130, 1138-39, 16 L.Ed.2d 218 (1966), for support makes clear that the dismissal was without prejudice. Otto is free to pursue her claims of breach of contract and common law fraud in state court
 
 
 [2]
 In the Securities and Exchange Commission's discussion accompanying the enactment of Rule 151, the SEC emphasized that the Rule does not attempt to cover all annuity contracts that are exempt from the provisions of the Securities Act:
 Rule 151 is merely a "safe harbor," not an all-inclusive definition purporting to encompass every annuity contract that falls within the section 3(a)(8) exclusion.... [T]he rule simply defines a class of annuities that the Commission believes is clearly entitled to rely on the section. While compliance with rule 151 will assure "non-security status," failure to comply with the rule would not mandate "security status" for an annuity product.... [A]n insurer offering a contract that ... does not satisfy all of the rule's conditions may still rely directly on section 3(a)(8), albeit with no Commission assurance that the contract is covered by the section 3(a)(8) exclusion.
 Definition of Annuity Contract, Discussion Accompanying Enactment of Rule 151, Securities Act Release No. 6645, Fed.Sec.L.Rep. (CCH) p 84,004, at 88,129 (May 29, 1986).
 
 
 [3]
 Illinois has not established a minimum rate of interest for individual annuities under its nonforfeiture statute. Accordingly, we rely on the minimum rate required to be paid for individual annuity contracts under the National Association of Insurance Companies Standard Nonforfeiture Law
 
 
 [4]
 The Commission noted that when it offered the proposed Rule 151 for public comment, several commentators asked how the one-year requirement would be applied to annuities that computed excess interest according to alternative methods such as the banding method used here. The Commission responded as follows:
 In this regard, one commentator observed that excess rates may be established on a contract basis, pursuant to which rates are declared for all funds under the contract, or they may be determined on a payment basis, where specified rates are established for all payments received in a particular time period (day, month, quarter, etc.).
 * * *
 ... [The Commission does not] wish to prevent insurers from establishing rates on a contract basis or a per payment basis, as described above.
 Definition of Annuity Contract, Discussion Accompanying Enactment of Rule 151, Securities Act Release No. 6645, Fed.Sec.L.Rep. (CCH) p 84,004, at 88,134-35 (May 29, 1986).
 
 
 [5]
 As Otto admitted in her reply to the defendants' motion to dismiss and for summary judgment:
 It must be emphasized that after the enabling agreement is signed and an employee signs up, nothing but the ministerial duty of withholding the amount designated by the employee and sending it to the company remains for the school district to perform. The school district cannot manage funds, make investment decisions, determine claims, determine benefits, determine costs, change terms, or do anything about the contract. All it can do is withhold money pursuant to the employee's authorization and send it to the annuity company. Thus, these investment annuity contracts are not contracts maintained by the school district. R. 131, at 32 (emphasis in original).
 
 
 [6]
 Otto also relies on 26 U.S.C. Sec. 403(b), which provides tax-exempt status to an "annuity contract [that was] ... purchased by an employer." She contends that it is inconsistent for the annuity to be deemed to be purchased by an employer for purposes of section 403(b) but not deemed to be maintained or established by an employer for purposes of ERISA. This argument is meritless
 
 
 [7]
 In her brief, Otto emphasizes that "the mechanics of these programs are important for purposes of this litigation." Appellant's Brief at 4. She describes the plan as follows:
 In the usual situation--and this is true in the case of the named plaintiff Otto--an employer is contacted by a number of companies to make available their respective plans to the employer's employees....
 The master contract merely empowers the employer to collect the contribution from the employee and pay it over to the company.... The employer has no rights of any kind as to investments, pay-outs, records or anything else relating to the investment contract. All matters rest with VALIC and VAMCO the companies selling the contract. The employer abdicates all responsibility of any kind for the plan, except for the sole act of collecting funds and turning them over to the company....
 Id. at 4.
 
 
 [8]
 As this court has stated, "[i]t is a well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered. If it does not do so, and loses the motion, it cannot raise such reasons on appeal." Liberles v. County of Cook, 709 F.2d 1122, 1126 (7th Cir.1983)
 Further, even if Otto was permitted to raise this argument, her vague suggestion that the facts she has repeatedly recited "may be unique to Otto," Appellant's Brief at 30, may be insufficient to rebut the defendants' strong showing that there exists no genuine dispute as to any material fact relating to the ERISA claim. A plaintiff is required to respond to a defendant's motion with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). "Thus, the mere possibility that a factual dispute may exist, without more, is not sufficient to overcome a convincing presentation by a moving party." Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d 438, 445 (2d Cir.1980) (emphasis in original); see also Celotex Corp. v. Catrett, --- U.S. ----, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).
 
 
 [9]
 "Even though no specific 'enterprise' was named in the Amended Complaint, the status of VAMCO, which made the fraudulent mailing as an agent for its parent VALIC, is obvious." Appellant's Brief at 37
 
 
 [10]
 "[A] distinctive aspect of a RICO conspiracy is the need to establish the existence of an enterprise." 791 F.2d at 499. "[C]onsent to the commission of two criminal acts standing alone does not constitute a RICO conspiracy. The defendant must also agree to 'conduct or participate in the affairs of the enterprise.' Both these elements must be present and together they establish a conspiracy the objective of which is a violation of RICO." Id. at 499 n. 5
 
 
 [11]
 Appellate courts in analogous situations have chosen to decide, rather than remand, issues where the issue was simple, its resolution was clear, and the parties had been afforded a full opportunity to be heard. See, e.g., Richmond Leasing Co. v. Capital Bank, 762 F.2d 1303, 1313 (5th Cir.1985) ("Remand is unnecessary ... if 'all the facts relied upon to support the judgment are in the record and are undisputed, or if the record as a whole presents no genuine issue as to any material fact.' ") (quoting King v. Commissioner of Internal Revenue, 458 F.2d 245, 249 (6th Cir.1972); Shaw v. F.B.I., 749 F.2d 58, 63 (D.C.Cir.1984)) ("Since there are no disputed facts, it would be futile to remand the issue to the District Court and we proceed to its resolution."); In re Hronek, 563 F.2d 296, 298 (6th Cir.1977) ("Although we recognize that the normal procedure is to remand a case where the lower court has not considered a pertinent issue, considerations such as judicial economy dictate otherwise where the correct resolution of the issue is clear."); Smith v. Government of Virgin Islands, 329 F.2d 135, 142 (3d Cir.1964) ("Since the record made below fairly presents the issue as to whether [defendants] are entitled to summary judgments judicial economy will patently be served by an immediate determination of this issue rather than remanding these cases to the District Court for disposition.")
 
 
 [12]
 Otto also argues that the magistrate construed the defendants' motion as one requesting only dismissal under Rule 12(b)(6). The magistrate did not mischaracterize the defendants' motion. At the outset of her opinion, the magistrate acknowledged that the defendants' motion sought either dismissal or summary judgment
 
 
 [13]
 Motions pursuant to Rule 60(b) must be made "within a reasonable time" and in some instances within one year of the judgment. If Otto's motion was properly brought under Rule 60(b), it was not untimely