134 F.3d 841
 Fed. Sec. L. Rep. P 90,128
Beverly OTTO, individually and on behalf of all others
similarly situated, Plaintiff-Appellant,
v.
VARIABLE ANNUITY LIFE INSURANCE COMPANY, Charles T. Bauer,
Mortimer M. Caplin, et al., Defendants-Appellees.
 No. 96-2107.
 United States Court of Appeals,
Seventh Circuit.
 Argued Oct. 29, 1997.
Decided Jan. 16, 1998.
Rehearing and Suggestion for Rehearing
En Banc Denied March 18, 1998.
 
 William J. Harte, Joseph E. Tighe, Chicago, IL, Herbert I. Rothbart, Charles J. Corrigan, Craig E. Anderson (argued), Jacobson, Brandvik & Anderson, Chicago, IL, for Plaintiff-Appellant.
 Matthew E. Wilkins, Ungaretti & Harris, Chicago, IL, Michael F. Braun, Schuyler, Roche & Zwirner, Chicago, IL, Randall L. Mitchell, Paul E. Lehner, Adducci, Dorf, Lehner, Mitchell & Blankenship, Chicago, IL, Michael W. Coffield (argued), Coffield & Associates, Chicago, IL, for Defendants-Appellees.
 Before FLAUM, RIPPLE and EVANS, Circuit Judges.
 RIPPLE, Circuit Judge.
 
 
 1
 This successive appeal concerns retirement investments made by employees of various non-profit entities through an investment program with Variable Life Insurance Corporation ("VALIC"). After this court remanded certain matters to the district court in Otto v. Variable Life Insurance Company, 814 F.2d 1127 (7th Cir.1987), cert. denied, 486 U.S. 1026, 108 S.Ct. 2004, 100 L.Ed.2d 235 (1988), this case went to trial on two primary claims, an allegation that various defendants violated securities laws and an allegation that various defendants had breached contracts with the plaintiff class. At the close of the plaintiffs' case, judgment was entered in favor of all defendants with the exception of VALIC. The jury returned a verdict in favor of VALIC on both of the claims, and judgment subsequently was entered on that verdict. Ms. Otto now appeals from the entry of judgment on the verdict in favor of VALIC and from the entry of judgment in favor of the Variable Annuity Marketing Company ("VAMCO"), a subsidiary of VALIC and one of the corporate defendants in whose favor judgment was entered at the close of Ms. Otto's case. For the reasons set forth in this opinion, we affirm the decisions of the district court.
 
 
 2
 * BACKGROUND
 
 A. Facts
 
 3
 This dispute centers on the rates of return that allegedly should have been available to all investors on funds deposited in retirement accounts operated by VALIC and on disclosures that allegedly should have been made, but were not, with regard to VALIC's methods for crediting those accounts with certain periodic interest awards. Beverly Otto brought this action on behalf of herself and a class of similarly situated Illinois residents[1] who participated in VALIC's fixed annuity program between October 17, 1975, and August 2, 1982 (the "class period"). VALIC is a life insurance company formed under the laws of the State of Texas that sells annuity products through its group annuity program to employees of various non-profit entities, such as school districts and hospitals.1. Group Contract and Investment Overview
 
 
 4
 In March 1968, VALIC entered into a group unit purchase ("GUP") contract with Ms. Otto's employer, the Maine Township High School District # 207. This contract, similar to others executed by VALIC, was the vehicle through which VALIC offered its annuity investments to the employees of school district # 207. In 1975, Ms. Otto, a teacher in district # 207, obtained a list of annuity companies that had signed group agreements with her employer. One of the companies on the list was VALIC. After receiving information from several of the companies, Ms. Otto chose to invest with VALIC.
 
 
 5
 Under the terms of the GUP contract, participants in VALIC's investment program had two different investment accounts from which to choose. Participants were provided the option to invest funds in a "Fixed Dollar Annuity" account or in a "Variable Annuity" account according to whatever allocation method they chose. For instance, participants could invest all funds in one or the other account, or they could divide the funds between the two. The program participants were also permitted to transfer all or any portion of the funds in one account over to the other. As the names of the accounts suggest, VALIC invested the participants' funds in different types of financial instruments; consequently, the accounts had different risk and return characteristics. The investors' funds placed in the variable account were aggregated by VALIC in a separate account and were invested principally in common stocks and other equity investments. Therefore, the rates of return on the retirement monies invested in the variable account fluctuated with the market. VALIC made no guarantee with respect to the returns available on funds invested in the variable account or even with respect to the principal; the program participants bore the risk exclusively. As a result, the variable account was registered as a security and VALIC issued annual prospectuses describing it.
 
 
 6
 In contrast, retirement funds invested in the fixed account went into VALIC's general account and were invested primarily in low-risk, long-term debt instruments. The terms of the GUP contract provided that the principal invested in the fixed account was guaranteed by VALIC. VALIC also guaranteed a 4% return on all funds deposited in the fixed account.[2] Once interest was credited to the account, it became principal, and the 4% was guaranteed on that new combined amount. VALIC also regularly awarded "excess interest" on funds in the fixed account in addition to the guaranteed rate. The GUP contract indicates that whether such excess interest was to be awarded was completely within the discretion of VALIC's Board of Directors.[3]
 
 2. Interest Crediting Methods
 
 7
 The method utilized by VALIC to calculate and to award excess interest on funds in the fixed account and the company's alleged failure to disclose to program participants what method was being employed have been significant issues in this litigation. Historically, VALIC has employed one of two methods for calculating the amount and timing of interest awards: the "banding" or "new money" method; and the "portfolio" method. Under the banding method, VALIC declared an interest rate that was available for funds invested during a particular period. That specific interest rate was applied only to, and was indefinitely guaranteed for, funds that were invested in the fixed account during that period. The funds invested during the relevant period, therefore, were "banded" to the declared current rate of interest,[4] irrespective of subsequent interest rate changes.
 
 
 8
 This banding method allowed VALIC to provide a current rate of interest that reflected the rate of return that the company was realizing on the funds as it reinvested them for that period. Therefore, in periods of rising interest rates, VALIC was able to provide increased current rates by increasing the excess interest awards on the fixed account investments because VALIC was realizing higher returns on the more recently reinvested funds. An employee's paycheck contribution to the fixed account was treated as a new investment at the time it was contributed, and that investment was banded to the current rate that applied to that period.
 
 
 9
 In contrast, under the portfolio method of awarding interest, VALIC would pay a single rate of interest on all deposited funds regardless when the funds were invested. When a new rate of interest was declared, that rate then would apply to all funds presently invested without regard to when they were invested. These portfolio rates of interest therefore are generally less reflective of increasing or decreasing returns realized by an investment company in a given period because the interest rates awarded are based on the average rates of return realized across all investments held by the company, not just on the rates realized on the more recent investments as with the banding method. Consequently, current rates of interest awarded under a portfolio method do not rise as fast as current rates under the banding method in times of generally increasing interest rates.
 
 
 10
 VALIC employed the portfolio method to award interest on fixed account funds under the GUP contract from 1968 until 1972. During the class period, VALIC utilized the banding method to credit interest. Accordingly, during the class period, each monthly contribution by an employee to the fixed account was treated as a new investment. The interest awarded on each investment depended on the current rate that was in effect for that period. In the years from 1975-78, interest rates generally were stable. The periodic current rate paid by VALIC during those years was 8%. Consequently, at that time, program participants' funds were not affected by the method VALIC used to credit the interest to the fixed account funds. In 1979, however, interest rates began to rise rapidly, and they continued their upward march until 1982. Over this period, VALIC increased its current rates nearly every quarter, topping out in the third quarter of 1982 at 14.5%. Under the banding method, the funds contributed to the fixed account in a given quarter during those years were banded to the rate declared in that quarter. The program participants' funds contributed to the fixed account prior to 1979 were banded permanently to the prior 8% rate. Therefore, according to Ms. Otto, from 1979-82 the banding method used by VALIC to credit interest to the fixed account funds had a deleterious impact on the rate of return that she and the plaintiff class earned in contrast with the earnings that should have been available under the portfolio method.
 
 
 11
 3. The Practice of "Round-tripping"
 
 
 12
 During this period of rising interest rates, some participants in the investment program realized a way to avoid having their earlier invested funds banded to (or stuck with) the lower rates of interest. They learned that they could beat the bands by moving all of their funds from the fixed account to the variable account, and then retransferring the funds back to the fixed account a day later. This practice, called "roundtripping," allowed the investor to realize the most current banded rate on all of his or her funds with little risk. This advantage resulted from the fact that funds placed in the fixed account were banded to the rate in effect at the period in which the funds were invested. When investors exercised their contractual right to move their funds from the variable account back into the fixed account, the retransferred funds were treated as a new investment and thus enjoyed the current banding rate. VALIC realized that this activity was occurring and became concerned because roundtripping circumvented the whole point of the banding system. Round-tripping essentially allowed investors to achieve a portfolio rate, but at a higher current rate of interest than would have been provided by VALIC if it had been using a portfolio system. If all of the program participants had round-tripped during the 1979-82 period of escalating interest rates, the practice would have had a negative financial impact on VALIC because the interest awards would have exceeded the rate of return that VALIC was receiving across all of the investments it made with the fixed account funds. Not surprisingly, VALIC altered its rules in 1979 so that a transfer of funds to the variable account had to last for 90 days[5] in order for the retransfer to the fixed account to be treated as a new investment. This provided a disincentive to round-trip because there was a risk that funds invested in the variable account would decrease in value prior to the retransfer. In addition, there was no guarantee that the next current rate declared for the fixed account would be higher than or as high as the previous current rate. However, at no time did VALIC restrict the right of program participants to transfer freely their funds from one account to the other as frequently as they chose. The right to transfer was not compromised by the waiting period.
 
 
 13
 4. Dissemination of the Investment Information
 
 
 14
 The investors in VALIC's program, including Ms. Otto, were informed about the details of their annuity investments in various ways. Once an investor chose to participate in a group program provided by VALIC, the investor received a certificate indicating that he or she was a participant in the retirement plan. That certificate detailed some aspects of the investment. A more comprehensive and consumer-oriented description of the investment was provided in the Owner's Manual, one of three versions of which was provided by VALIC to plan participants who joined the program during the class period. VALIC also disclosed information about its products to participants and potential participants through its sales representatives. These individuals educated the employees of non-profit organizations about VALIC's products through meetings, phone calls and correspondence. In addition to these methods of informing investors about the fixed account investment, VALIC provided prospectuses with regard to the variable account. During the class period, eight versions of the annual prospectus were issued by VALIC. Investors received the version that was in place when their participation in the program commenced.
 
 B. Earlier Proceedings
 
 15
 The class action brought by Ms. Otto ultimately went to trial on two counts. In Count I, she claimed that VALIC had intentionally failed to disclose material information regarding the class' investments, including the fact that VALIC was using the banding method of interest crediting, in violation of the Securities Exchange Act of 1934. Ms. Otto also claimed that VALIC engaged in a conscious practice of concealing from the class the practice of round-tripping and that it failed to disclose the rules regarding that practice to the class. In Count II, Ms. Otto contended that VALIC breached various of its contractual obligations, including the breach of a contractual promise to pay investors interest using the portfolio method. Ms. Otto also presented an alternative contractual theory, alleging that VALIC breached its duty to allow round-tripping by imposing the waiting period on retransfer of funds in order for that practice to achieve its desired result. At the close of Ms. Otto's case, the district court granted judgment in favor of all the defendants in the case, except for VALIC, because it found that there was no evidence to indicate any contractual relationship between those defendants and the class. Consequently, the two counts went to the jury with respect to VALIC. After several days of deliberation, the jury found in favor of VALIC on both counts.
 
 II
 DISCUSSION
 
 16
 On appeal, Ms. Otto challenges several aspects of the trial. She claims that the jury's verdict in favor of VALIC was contrary to the evidence with respect to both counts, that the court erred in granting judgment in favor of VAMCO at the close of the plaintiff's case, that the court misinstructed the jury, and that the court erred in excluding certain evidence. We turn first to the issue of jury instructions because that discussion sheds light on the sufficiency of the evidence challenges.
 
 A. Jury Instructions
 
 17
 The scope of our review in evaluating whether the district court properly instructed the jury is limited. This court first addresses " 'whether the instruction misstates or insufficiently states the law,' and if the answer is affirmative, then we determine if the error prejudiced one of the parties." United Airlines, Inc. v. United States, 111 F.3d 551, 555 (7th Cir.1997) (quoting E.E.O.C. v. AIC Sec. Investigations, Ltd., 55 F.3d 1276, 1283 (7th Cir.1995)). As this court has stated on prior occasions, we shall not focus on minutiae in this review; instead, "we ask whether the instructions, when considered in their entirety and not in isolation, were sufficient to inform the jury of the applicable law." DePaepe v. General Motors Corp., 33 F.3d 737, 743 (7th Cir.1994); United States v. Dack, 987 F.2d 1282, 1284 (7th Cir.1993) ("[W]e must construe the instructions in their entirety, not in isolation, and look for overall fairness and accuracy.").
 
 
 18
 Ms. Otto asserts that the district court improperly instructed the jury with respect to the contract and VALIC's obligations thereunder. Specifically, Ms. Otto contends that the district court was required to provide one of two types of instructions depending on whether the court found that the contract was ambiguous with respect to the interest crediting method required under the contract. If the district court found that the contract was unambiguous, Ms. Otto argues, it was required, in accord with Illinois law,[6] to instruct the jury on the meaning of the contract and the obligations that arose under it.[7] However, if the district court found that the contract was ambiguous, Ms. Otto maintains that it was the district court's responsibility to identify the ambiguity and to guide the jury on how to resolve the ambiguity. Because the district court did not follow either of these courses, Ms. Otto contends that the jury was not properly instructed.
 
 
 19
 The primary flaw in this argument is that it is predicated on the district court's acceptance of Ms. Otto's view of what comprised the "contract." Ms. Otto's view of what documents embody the relevant contract between the class and VALIC has varied over the course of the litigation. However, by the time the case went to the jury, the plaintiffs' position, as indicated in the Amended Complaint, was that:
 
 
 20
 The salient terms of the contract among the class members and the corporate defendant are found in (1) the Group Annuity Contracts entered into between defendant and investors' employers, (2) the certificates given to investor participants upon enrollment in the Group Annuity Contract Plan (which Certificates include descriptions of the Plan), (3) the prospectus given to investors prior to entry into the investment program, and (4) the owners manual provided to class members upon commencement of investment and thereafter made available to any investor upon request.
 
 
 21
 R.689 p 85. As VALIC notes, the evidence established that, during the class period, eight versions of the annual prospectus and three versions of the Owner's Manual were issued by VALIC. Ms. Otto relied on all of these documents to support her theory that VALIC owed certain contractual duties to her and the class, including the duty to award interest under the portfolio method and the duty to provide a "complete profile" of activities in the customer's account. In contrast, VALIC maintains that the only contract relevant to this dispute is the GUP contract, and that this contract created none of the duties that Ms. Otto alleged had been breached.
 
 
 22
 Ms. Otto relies on Illinois case law for the proposition that the district court should have interpreted the contract as a matter of law and instructed the jury on its meaning. See, e.g., TDC Dev. Corp. v. First Fed. Sav. & Loan Ass'n of Ottawa, 204 Ill.App.3d 170, 149 Ill.Dec. 446, 449, 561 N.E.2d 1142, 1145 (1990) (indicating that "construction of a contract presents a question of law ... for the trial court's determination" (citation omitted)); National Tea Co. v. Commerce & Industry Ins. Co., 119 Ill.App.3d 195, 74 Ill.Dec. 704, 708, 456 N.E.2d 206, 210 (1983) (stating that "only if the contract is ambiguous and the extrinsic facts necessary to determine the parties' interpretation thereof are in controversy should the question of interpretation [of the contract] be left to a jury"). In the alternative, Ms. Otto maintains that if the district court determined that the contract was ambiguous, then it was obligated to instruct the jury with regard to what conclusions it should reach if certain facts were found to exist. See National Tea, 74 Ill.Dec. at 708, 456 N.E.2d at 210 (stating that a jury should not be required to interpret a contract "without guidance from the court in the form of an instruction stating what conclusion must be reached if the jury finds certain facts to exist"). VALIC maintains that the jury instructions were proper because they principally consisted of Illinois Pattern Instructions regarding Illinois contract law, they presented to the jury both versions of what the relevant contract was and they required any ambiguities to be construed against VALIC.
 
 
 23
 We are convinced that the jury was properly instructed in this case. First, it is clear that the parties disputed what the contract comprised. Consequently, the court properly left it to the jury to decide what the terms of the contract were. See Mulliken v. Lewis, 245 Ill.App.3d 512, 185 Ill.Dec. 730, 732, 615 N.E.2d 25, 27 (1993) (stating that "[w]hether a contract exists, its terms, and the intent of the parties are questions of fact for the trier of fact" (emphasis omitted)); In re Estate of Kern, 142 Ill.App.3d 506, 96 Ill.Dec. 815, 820, 491 N.E.2d 1275, 1280 (1986) (stating that "whether an oral contract exists, its terms and conditions and intent of the parties are questions of fact"). In light of the dispute over exactly which documents embodied the contract, the district court was not presented with a situation where it could simply interpret the contract as a matter of law and instruct the jury on its meaning, as Ms. Otto urges that the court should have done. Instead, the jury was in the best position, in light of all the documentary and testimonial evidence, to glean the intent of the parties and to determine the terms of the contract. See DeLathouwer v. Kewanee Boiler Corp., 94 Ill.App.3d 802, 50 Ill.Dec. 580, 584, 419 N.E.2d 688, 692 (1981) (" '[I]f the meaning of the contract is uncertain in light of the extrinsic evidence, then the intent of the parties to the contract must be determined as a question of fact by the jury or by the court in a trial without a jury.' " (quoting Nerone v. Boehler, 34 Ill.App.3d 888, 340 N.E.2d 534, 537 (1976))). Accordingly, the district court properly instructed the jury that it was for it "to determine whether any or all of the contract terms asserted by Plaintiffs and denied by VALIC are terms of the parties' investment contracts."[8] R.699.
 
 
 24
 The instructions provided adequate guidance to the jury. The jury was instructed clearly concerning what breaches Ms. Otto alleged had occurred.[9] The district court instructed the jury to determine the contract terms and to determine if VALIC had committed any of the alleged breaches in light of the contract terms as the jury found them to be.[10] The court also set forth the plaintiffs' burdens of proof and instructed the jury what verdict to render if it determined that those burdens were or were not met. We hold, therefore, that the jury instructions did not misstate or insufficiently state the law and that the jury was provided with adequate guidance to render its verdict.
 
 B. Insufficiency of Evidence Claims
 
 25
 We turn next to Ms. Otto's argument that the jury's verdicts in favor of VALIC on both the securities law violation count and the breach of contract count were contrary to the evidence. We do not lightly set aside a jury's verdict on the ground that the evidence was insufficient. In fact, in "examining the propriety of a jury verdict we ask only if it had 'a reasonable basis in the record.' " Dallis v. Don Cunningham & Assocs., 11 F.3d 713, 715 (7th Cir.1993) (quoting Goetz v. Cappelen, 946 F.2d 511, 516 (7th Cir.1991)); Trzcinski v. American Cas. Co., 953 F.2d 307, 315 (7th Cir.1992) ("We will not set aside a jury verdict if a reasonable basis exists in the record to support the verdict."). Consequently, Ms. Otto faces an uphill battle to achieve a reversal on this issue. She challenges the jury's verdict with respect to each count. We address first the contract claim, followed by the securities law violation claim.
 
 1. Contract Claim
 
 26
 Ms. Otto asserts that the evidence adduced at trial indisputably demonstrated that VALIC had breached various contractual duties. Essentially, Ms. Otto's position is that various documents that she reads as the contract, combined with certain other evidence, indicate that VALIC had at least three specific obligations to Ms. Otto and the class that were breached. First, Ms. Otto argues that the GUP contract and the Owner's Manuals clearly establish that VALIC was to credit interest using the portfolio method.[11] Consequently, she views VALIC's use of the banding method of interest crediting during the class period as a breach of contract. Second, Ms. Otto asserts that the evidence established that VALIC was contractually required to provide a "complete profile" of their accounts to all program participants.[12] Ms. Otto contends that VALIC's failure to disclose to investors a material aspect of those accounts--the type of method used for crediting interest--thus constituted a breach of the contractual requirement to provide a complete profile. Third, Ms. Otto maintains that VALIC breached its clear contractual obligation to allow round-tripping by imposing the waiting period on the retransfer of funds as a precondition to its eligibility for banding. The waiting period was a breach, Ms. Otto alleges, because it restrained the right to transfer and because it effectively prevented investors from achieving the portfolio rate on their funds.
 
 
 27
 After a thorough review of the record, we conclude that there was ample evidence before the jury to permit it to determine either that none of these asserted obligations was a term of the contract or that, even if some of these obligations were contractual duties, they were not breached. As we noted above, VALIC denied at trial that the Owner's Manuals or documents other than the GUP contract imposed any contractual obligation on VALIC. Instead, VALIC argued that those materials were descriptive in nature and were designed to inform investors in nontechnical terms about their investment. In addition, VALIC pointed to the integration clause in the GUP contract to support its claim that the only contract terms are those included in the GUP contract. The jury was entitled to decide that only the GUP contract contained VALIC's contractual obligations and that VALIC was not contractually obligated to use the portfolio method of crediting. Even if the GUP contract could be read as describing a portfolio method of crediting, nothing in that contract expressly requires the use of such a method. Nowhere in the GUP contract is there an explicit requirement for or reference to portfolio interest crediting. Notably, the GUP contract also indicates that the award of excess interest is within the sole discretion of VALIC's Board of Directors. The jury therefore would have been justified in finding that the discretion to choose how to award the excess interest at issue here was included in the discretion to award any excess interest at all. Indeed, even if the jury concluded that the contract included the Owner's Manuals, those documents also do not state that a portfolio method was required. Moreover, the jury had before it testimony of VALIC's witnesses who indicated that the statements in the Owner's Manuals pertaining to past interest crediting were just as consistent with the banding as portfolio methods.
 
 
 28
 Similarly, the jury had sufficient evidence before it to conclude either that there was no contractual duty to provide a "complete profile" of the account or that VALIC had provided such a profile. If the jury concluded that the Owner's Manuals' terms did not form part of the contract, as VALIC had argued, then VALIC was under no contractual obligation to provide investors with that information because the mention of the profile only is found in the Owner's Manuals. Even if the jury concluded that there was such a contractual requirement, there was evidence that VALIC was in the practice of providing quarterly confirmation reports to the program participants. Those confirmations detailed the account activity that occurred during the period and indicated the interest rate applicable to the funds invested in the next quarter. The jury therefore had evidence before it to determine that VALIC had provided the investors with a "complete profile" of their accounts.
 
 
 29
 Finally, there was sufficient evidence for the jury to conclude that VALIC did not breach any contractual obligation by imposing the waiting period on the transfer of funds from the variable account to the fixed account as a condition precedent to obtaining the current band of interest on the full amount of funds. VALIC does not dispute that investors had the right to transfer the funds from one account to the other whenever they chose to do so. Indeed, VALIC points out that at all times investors had the right to transfer their funds. The only effect of the waiting period was to prevent evasion of the banding system, a practice which operated to the detriment of the company and its other investors. The jury was entitled to find that the waiting period did not violate VALIC's contractual obligation under the GUP contract to allow transfer of the funds from one account to the other. In addition, because the jury also had ample evidence before it to determine that VALIC was not required to provide a portfolio method of interest crediting, the interference with the practice of round-tripping did not violate a contractual duty to allow investors to achieve a portfolio rate of interest on their total fixed account funds. In fact, investors were permitted to achieve a portfolio rate at the new banded rate of interest on their entire accounts but, in order to achieve that result, were required to take some risk by placing those funds in the nonguaranteed variable account for a certain period. We conclude, therefore, that the evidence permitted the jury reasonably to determine that VALIC did not breach any contractual obligation to the class.
 
 2. Securities Law Claim
 
 30
 This same result obtains with regard to the securities law violation count. Ms. Otto alleged that VALIC violated the Securities Exchange Act of 1934, specifically Rule 10b-5 promulgated thereunder. In order to prove such a violation, a plaintiff must establish that (1) the defendant made a false statement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of securities (5) upon which the plaintiff justifiably relied (6) and that the false statement or omission proximately caused the plaintiff's damages. See Caremark, Inc. v. Coram Healthcare Corp., 113 F.3d 645, 648 (7th Cir.1997).
 
 
 31
 Ms. Otto presented an omission theory to the jury. On appeal, Ms. Otto first asserts a general allegation that losses were caused by the fact that investors were not aware that the banding method was being used. She asserts that the evidence established that VALIC intentionally had failed to disclose to the investors that VALIC was using the banding method of interest crediting. In addition, Ms. Otto asserts that it was clear from certain documentary evidence and the trial testimony that VALIC's policy was to reveal selectively the practice of round-tripping to the investors, because, if every investor had been aware of the practice, it would have been very detrimental to VALIC's financial condition. These omissions were material to the investors, Ms. Otto submits, because they prevented the program participants from understanding how their investments were earning a return and how to achieve the portfolio rate of return that should have been available to them. Ms. Otto relies on various statements of VALIC employees to establish that VALIC intentionally failed to inform investors of the banding method and the ability to round-trip. A former head actuary at VALIC, Stephen Bickel, testified regarding the problems that would have been caused if widespread round-tripping was allowed to continue unchecked.[13] There was also in evidence a memo he sent to VALIC's president shortly after discovering an increase in roundtripping which outlined the same concerns.[14] As a result of the concerns about round-tripping, Ms. Otto alleges, VALIC intentionally concealed this practice from most of its investors.[15] Consequently, those uninformed investors experienced losses because they were unable to achieve the most favorable interest rate on their entire portfolio.
 
 
 32
 There was sufficient evidence for the jury to conclude that no Rule 10b-5 violation occurred. VALIC presented evidence that it disclosed, by several means, that it was using the banding method and that round-tripping was an option. VALIC points out that, during the period of rising interest rates, VALIC supplied quarterly statements to all investors. These statements contained a legend stating the current rate of interest to be credited to funds invested in the next quarter.[16] Because each of these quarterly statements announced a particular interest rate for the subsequent quarter, the jury was entitled to believe VALIC's argument that these statements, viewed in their totality, constituted a disclosure of the banding method. In addition, there were numerous documents in evidence that VALIC had provided to school districts, teachers associations, teachers unions and others explaining the banding method that VALIC was utilizing on its fixed annuity investments. Furthermore, there was evidence that VALIC's company policy was to inform the investors of banding and of the practice of round-tripping through its sales representatives. In light of the amount of evidence of disclosure, there was a reasonable basis for the jury to determine either that there was no omission of a material fact, or if there was, that VALIC did not intentionally conceal or fail to disclose information to its investors. Consequently, we conclude that there was a reasonable basis in the record for the jury to find in favor of VALIC on the securities violation claim.[17]
 
 C. Evidentiary Rulings
 
 33
 Ms. Otto next alleges that two in limine evidentiary rulings made by a magistrate judge were erroneous. Specifically, Ms. Otto argues that the district court erred in refusing to admit a document known as the "Hansen Report" and that she was prohibited improperly from presenting argument based upon a legend contained in the prospectuses issued by VALIC. We review motion in limine evidentiary rulings, like most evidentiary rulings, under an abuse of discretion standard. See Gagan v. American Cablevision, Inc., 77 F.3d 951, 966-67 (7th Cir.1996).
 
 
 34
 The Hansen Report that Ms. Otto claims should have been allowed into evidence is a document that was prepared by A.S. Hansen, Inc., for the A.H. Wohlers Company, which in turn apparently commissioned the study on behalf of the Chicago Teachers Union ("CTU"). The purpose of the Hansen report was to analyze the tax-sheltered annuity programs offered to employees of the Chicago Board of Education. Ms. Otto alleges that the funds invested by employees of the Chicago Board of Education, who were "principally members of the Chicago Teachers Union," comprised between 30% and 70% of the total funds invested with VALIC during the class period. Appellants' Br. at 46. Ms. Otto claims that the report was disseminated to the CTU at the time the CTU endorsed VALIC as the preferred provider of annuity products. The report is probative, Ms. Otto contends, because it indicates that VALIC used the portfolio method of interest crediting although, in actuality, VALIC was employing the banding method. Ms. Otto urges that the jury should have been permitted to learn of the Hansen Report's existence because VALIC did nothing to correct the inaccurate statement at any time during the class period. At the pretrial stage, the district court deferred ruling on the admissibility of the report pending a satisfactory showing of foundation.
 
 
 35
 Neither side does a very good job of informing the court of the litigation history of this evidentiary ruling. VALIC contends that Ms. Otto has waived the opportunity to argue this point on appeal because she failed to file an objection to it at the pretrial stage. Although it is true that in this circuit, "failure to file objections with the district judge waives the right to appeal," United States v. Brown, 79 F.3d 1499, 1503 (7th Cir.) (internal quotation omitted), cert. denied, --- U.S. ----, 117 S.Ct. 196, 136 L.Ed.2d 133 (1996), we cannot ascertain from the record whether there was a waiver of the issue. Arguably, no definitive ruling was made on the report at the pretrial stage and the matter was deferred pending an adequate demonstration of the foundation. It does appear, moreover, that the district court revisited the merits of the admissibility question during trial. VALIC states in its brief that Ms. Otto offered the report into evidence several times and was denied.[18] Neither side tells us where, in the 36 volumes of trial transcript material, we might locate the district court's definitive ruling.
 
 
 36
 We shall not attempt to unravel the path of this evidentiary dispute on our own. Suffice it to say that we see no basis to hold that the district court abused its discretion in refusing to admit the document. Certainly, Ms. Otto has not carried her burden of establishing such an error on the part of the trial court. It does not appear that an adequate foundation for the admission of the document was ever established. VALIC argues, and Ms. Otto does not dispute, that no witness from A.S. Hansen, A.H. Wohlers or the CTU testified about the authenticity of the document. See Fed.R.Evid. 901(a). This rule provides that the "requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Id. Ms. Otto did little to authenticate the Hansen report. She did not offer any witness or any affidavit of any person who had personal knowledge of the report.[19] The only evidence to establish the foundation for the report was a letter from A.H. Wohlers Company to VALIC which referred to the Hansen report.[20] Additionally, even if there was an adequate foundation, the report, to the extent that Ms. Otto sought its admission to prove the truth of the matter asserted, was hearsay, and Ms. Otto did not establish an exception to the hearsay rule with regard to the report. To the extent she sought its admission to demonstrate that VALIC never sought to correct the statement, the document was of minimal probative value and any error in its exclusion was harmless.
 
 
 37
 Ms. Otto also attacks the district court's decision prohibiting her from utilizing a legend on the prospectuses provided by VALIC in her arguments presented at trial. The legend is contained in the prospectuses that VALIC issued for the variable account; the prospectuses do not describe the fixed account investment that is at issue in this case. The legend indicates that no person had the authority to give information or to make representations with respect to the "offer contained in this prospectus." Pl. Exs. AA-II. Ms. Otto wanted to use that legend to respond to VALIC's arguments that it had fully disclosed the material information about the fixed account investment through, among other methods, the oral disclosures of its representatives. In Ms. Otto's view, VALIC had disclaimed, through the legend, the investors' ability to rely on oral statements made by VALIC representatives. A magistrate judge ruled in limine that "the significance of the legend in this case is too slight to justify the potential prejudice and confusion which would be caused by the argument Otto proposes." R.495, at 2. Ms. Otto did not file an objection to this ruling. Four years after the in limine ruling, the district court reaffirmed the magistrate judge's ruling on the ground that Ms. Otto failed to object to the original ruling. The rule in this circuit is that a party must file objections to the magistrate judge's rulings in order to preserve that issue for appeal. See Video Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir.1986) ("[F]ailure to file objections with the district judge waives the right to appeal all issues, both factual and legal...."). The purpose of this rule is to prevent a " 'litigant from "sandbagging" the district judge by failing to object and then appealing' " and to prevent " 'inefficient use of judicial resources.' " Brown, 79 F.3d at 1504 (quoting Thomas v. Arn, 474 U.S. 140, 148, 106 S.Ct. 466, 471, 88 L.Ed.2d 435 (1985)). In this case, there was clearly a waiver. Ms. Otto cannot avoid this finding by arguing that, at the time the ruling was made, it was not clear that VALIC would employ the oral disclosure defense, thereby rendering uncertain her need to rely on the legend. The requirement of timely objection cannot be made contingent on whether the pretrial ruling will actually be relied upon at trial.
 
 
 38
 However, even if Ms. Otto had objected to the ruling, we would not find that the district court abused its discretion in barring argument on the legend. The prospectuses described the variable account, not the fixed account. Consequently, the legend, by its clear language, disclaimed the authority of VALIC representatives to make oral representations with respect to the variable account investment. In contrast, the Owner's Manuals, which did pertain to the fixed account, encouraged investors to seek additional information from VALIC's representatives. Therefore, we find no abuse of discretion in the district court's refusal to permit argument on the prospectus legend.
 
 D. The VAMCO Ruling
 
 39
 The plaintiffs' final claim is that the district court erred when it granted judgment in favor of VAMCO on the securities law claim at the close of the plaintiffs' case. The district court held in a ruling made in open court that it saw no evidence "too [sic] indicate that anybody affiliated with ... VAMCO ... participated or had any contractual relationship with the plaintiff class." R.734-12, at 877.
 
 
 40
 The district court may grant judgment as a matter of law when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed.R.Civ.P. 50(a)(1). We review the district court's decision to grant judgment as a matter of law de novo, considering the evidence in the light most favorable to the nonmoving party. See Continental Bank N.A. v. Modansky, 997 F.2d 309, 312 (7th Cir.1993). "We will reverse the judgment only if enough evidence exists that might sustain a verdict for the nonmoving party." Id. Ms. Otto asserts that the evidence at trial established that VAMCO, a subsidiary of VALIC, was the marketing arm of the operation that promoted the investments at issue in this case. Consequently, Ms. Otto urges, if there was enough evidence for the jury to consider whether VALIC engaged in securities fraud, there must also have been sufficient evidence for the jury to consider if VAMCO, the company that marketed and sold the investments, also violated securities law.
 
 
 41
 We note that the plaintiffs' briefs are completely devoid of any reference to the record that would help this court identify what evidence established VAMCO's connection to VALIC, and what role VAMCO's employees had in selling the investments at issue here. Federal Rule of Appellate Procedure 28(a)(6) provides that argument must be supported by "citations to the authorities, statutes, and parts of the record relied on." This court has refused to consider unsupported or cursory arguments. See United States v. Berkowitz, 927 F.2d 1376, 1384 (7th Cir.) ("We repeatedly have made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues)."), cert. denied, 502 U.S. 845, 112 S.Ct. 141, 116 L.Ed.2d 108 (1991). Ms. Otto devoted all of three sentences to the argument on this issue. The matter is waived.
 
 
 42
 Although the parties' truncated treatment renders the matter waived, we note, on the basis of the information we have been able to garner on our own from the record, that the dismissal of VAMCO, even if error, was hardly prejudicial to Ms. Otto. The district court noted, without objection from counsel, that, at best, the evidence against VAMCO was, in essence, the same evidence as that against VALIC. The district court considered VAMCO to be no more than VALIC's agent. The jury found in favor of VALIC. A reasonable jury could not have determined that VAMCO, as distinct from VALIC, violated Rule 10b-5. Consequently, we conclude that the district court did not err in granting judgment as a matter of law in favor of VAMCO at the close of plaintiffs' case.
 
 Conclusion
 
 43
 After more than 15 years of litigation, this case finally draws to a close. We conclude that none of the issues on appeal warrants reversal or a new trial. Accordingly, the verdict in favor of VALIC and the judgment in favor of VAMCO stand.
 
 
 44
 AFFIRMED.
 
 
 
 [1]
 Although the action was originally brought on behalf of a putative nationwide class, the Amended Complaint was filed on behalf of Ms. Otto and a class of similarly situated Illinois residents. This class was certified over objection on March 15, 1984
 
 
 [2]
 The GUP contract provided for a base guaranteed rate of 3.5% compounded annually. However, for the first ten years of participation in the fixed account, that rate was increased by .5% for a total of 4% guaranteed interest
 
 
 [3]
 Specifically, the contract provides that "[b]y action of its Directors, VALIC may credit additional General Account accumulation units [interest] at any time." Pl.Ex. L, § 3.08
 
 
 [4]
 The current rate of interest was comprised of the guaranteed 4% rate plus the discretionary excess interest rate in effect for the announced period, usually a calendar quarter
 
 
 [5]
 Apparently, VALIC changed the length of the waiting period on various occasions. At its longest, the period apparently was 120 days
 
 
 [6]
 The GUP contract indicates that it "is delivered in the State of Illinois and is subject to the laws of that jurisdiction." Pl.Ex. L, at cover pg
 
 
 [7]
 Ms. Otto's position is that, among other things, the contract unambiguously indicates that VALIC was to use the portfolio method of interest crediting
 
 
 [8]
 This instruction followed an earlier one that explained to the jury the plaintiffs' theory of what documents comprised the contract:
 Plaintiffs further claim that the contract with VALIC consisted of (1) the Group Annuity Contracts entered into between VALIC and Plaintiffs' employers, (2) the certificates given to Plaintiffs upon enrollment in the Group Annuity Contract Plan, (3) the prospectus given to Plaintiffs prior to entry into the investment program, and (4) the owners manuals provided to Plaintiffs. VALIC denies that the contract with the Plaintiffs consisted of those documents.
 R.699.
 
 
 [9]
 The jury was instructed that:
 Plaintiffs further claim that the contract with VALIC imposed the following requirements upon VALIC and that VALIC failed to perform its obligations ... (1) by failing to pay the "current rate" of interest on all funds invested by the Plaintiffs in VALIC's fixed annuity program, as required by the contract; (2) by failing to provide a "complete profile" of Plaintiffs' accounts in their quarterly statements sent by VALIC, as required by the contract; and (3) by imposing restrictions on Plaintiffs' rights to secure the "current rate" of interest on all of their investments through the process of transferring the investments to the variable account and back, contrary to the contract.
 R.699.
 
 
 [10]
 Specifically, the jury was instructed that the plaintiffs had to prove, among other things, that "VALIC failed to perform one or more of its obligations under the contract, as you [the jury] have determined those obligations, and breached said contract, as you have determined it, in one or more of the ways claimed by Plaintiffs." R.699
 
 
 [11]
 The GUP contract, Ms. Otto alleges, necessarily contemplates and describes the portfolio method of interest crediting because the contract was executed in 1968. VALIC did not begin using the banding method until 1972. In addition, language contained in the three versions of the Owner's Manual that were distributed during the class period allegedly describes a portfolio method of interest crediting. For example, Ms. Otto relies on the following language from the 1974 Owner's Manual:
 The amount of excess interest paid in past periods to the fixed account has ranged from 1 3/4% to 4% per annum compounded. Total interest paid, therefore, has varied between 5 3/4% and 8% per annum compounded.
 Pl.Ex. B-1, at 8. Ms. Otto claims that, because this description of past interest awarded does not indicate that application of the different interest rates was tied to when the funds were deposited, it suggests that a portfolio method was in place.
 
 
 [12]
 Ms. Otto again relies solely on language in the Owner's Manuals to establish this contractual duty. For example, the 1974 Owner's Manual provides that "VALIC provides you a confirmation of each payment made for you. Each confirmation reflects a complete profile of your account." Pl.Ex. B-1, at 2. The 1977 Manual also states that the confirmation "will reflect the current value of the accumulated funds in your individual account as well as provide you with detailed information for each transaction occurring in your account." Pl.Ex. B-3, at 5
 
 
 [13]
 Mr. Bickel testified that:
 The banning [sic] system was a great system but, if someone were allowed to take the money in the fixed account, go into the separate account and then very quickly come back to the fixed account, they would be getting ... we would put that money into the newest band even though we really, in fact, had not had an opportunity to reinvest at higher rates.... [I]f a lot of [round-tripping] happened, it would, in effect, force us to lower the interest we were crediting overall.
 R.734-6, at 343.
 
 
 [14]
 The August 1979 Bickel memo stated in part:
 Bob Baldwin tells me that there has been an increase in activity of people trying to "beat the bands" by switching in and out of separate accounts.
 I have frequently advised Plumb and Copeland [former VALIC presidents] to establish rules to prevent this practice. The potential cost this year is extremely high.
 Pl.Ex. FFF.
 
 
 [15]
 Ms. Otto relies on trial testimony to support this argument. It does appear from the record that VALIC representatives told some investors and not others about round-tripping. In addition, the plaintiffs rely on a statement made by Mr. Bickel for the proposition that if everyone was aware of the practice, everyone would have done it. Specifically, the testimony Ms. Otto relies on provides:
 Q: Was it the policy of the company to have the sales representatives answer questions and deal with questions and to explain the parameters and the various factors of all of these interest changes and the ability to round-trip?
 A: Before 1979 it was my view that we shouldn't advertise that feature and we shouldn't be proactive as far as--because, otherwise, it would just, you know, make the whole system--turn the whole system into a portfolio system. But, as far as doing it on request or somebody was concerned about their past interest rates and so forth, sure, tell them, do it.
 R.734-6, at 344.
 
 
 [16]
 For example, Ms. Otto's account statement for the quarter ending March 31, 1979, indicates that "VALIC's Directors have announced that the current interest rate for deposits received in the fixed annuity during the second quarter of 1979 will be 8.5%." Pl.Ex. G-1
 
 
 [17]
 We decline VALIC's invitation to reverse our earlier holding and to affirm on the ground that the fixed account is not a security. This issue was determined during the earlier appeal after a rehearing. See Otto v. Variable Life Ins. Co., 814 F.2d 1127 (7th Cir.1987), cert. denied, 486 U.S. 1026, 108 S.Ct. 2004, 100 L.Ed.2d 235 (1988)
 
 
 [18]
 We were able to locate one such ruling barring admission of the report when it was offered at the close of the plaintiffs' case. Although VALIC argued that an insufficient foundation was established for the letter, the court appeared to deny the report's admission on the ground that it was hearsay and that Ms. Otto had failed to present adequate evidence to establish the business record exception to the hearsay rule. However, an ultimate ruling on the issue apparently was deferred because the court said that it would not admit the report "at this point." R.734-12, at 880
 
 
 [19]
 See United States v. Van Wyhe, 965 F.2d 528, 532 (7th Cir.1992) (stating that in order to lay a proper foundation for a book containing a photograph the defendant was "required to call a witness who had experience in the area ... or who otherwise had knowledge of the book or photograph")
 
 
 [20]
 The parties' briefs are silent with respect to whether this document was itself in evidence. However, we were able to locate a reference to the document in the offer for admission of the Hansen report made at the close of the plaintiffs' case. Ms. Otto's counsel read a portion of that letter and stated that "they [VALIC] put that in evidence." R.734-12, at 880. This statement was not contested by VALIC