Beverly S. MALONE, Plaintiff,

v.

ADDISON INSURANCE MARKETING, INC., et al., Defendants.

No. Civ.A 3:01–CV–259(H).

United States District Court, W.D. Kentucky at Louisville.

Sept. 27, 2002.

---

744

William Fletcher McMurry, Hans G. Poppe, McMurry & Talbot, Louisville, KY, Paul D. Young, Kim Levy, Milberg, Weiss, Bershad, Hynes & Lerach, New York City, for Plaintiff.

John K. Bush, Greenebaum, Doll & McDonald, Louisville, KY, Christopher K. Williams, Seth T. Taube, Richard B. Harper, McCarter & English, Newark, NJ, for Addison Insurance Marketing, Inc., ALMS Holdings, Inc., ALMS Ltd., Terry J. Ciotti, Michael P. MacIntyre, Joel L. Miller, Douglas J. Van Meter.

Cornelius E. Coryell, II, Christopher Tyson Gorman, Wyatt, Tarrant & Combs, Louisville, KY, Charles F. Smith, Donna L. McDevitt, Skadden, Arps, Slate, Meagher & Flom, Chicago, IL, for American Equity Investment Life Ins. Co. and David J. Noble.

Douglas C. Ballantine, John T. Ballentine, Jr., Ogden, Newell & Welch, Louisville, KY, Lori S. Blitsen, Randall A. Miller, Sedgwick, Detert, Moran & Arnold, for Financial West Investment Group.

Joseph Lee Hamilton, Marc S. Murphy, Marjories Ann Faris, Stites & Harbison, Louisville, KY, Peter B. King, Burton W. Wiand, Fowler, White, Gillen, Boggs, Villareal & Banker, Tampa, FL, Jonathan Schwartz, Marina Dle Ray, for Sentra Securities, Sidney Mondschein.

Patrick W. Michael, Angela L. Edwards, Mark B. Wallace, Woodward, Hobson & Fulton, Louisville, KY, for Victor E. Tackett, Jr.

F. Larkin Fore, Stephen H. Miller, Fore, Miller & Schwartz, Louisville, KY, David B. Dyer, Randall M. Foret, Secore & Waller, Dallas, TX, for Williams Financial Group.

## MEMORANDUM OPINION

HEYBURN, Chief Judge.

Plaintiff, a 73–year old widow and Kentucky resident, brought this class action under the Securities and Exchange Act of 1934 to recover for the harm caused to her and members of the class by Defendants' fraudulent sale of living trusts and other investments.[1] Defendants are seven corporations and seven individuals who sold Plaintiff these products as well as provided her with legal, investment, and insurance advice.[2] The Court appointed Malone as the Lead Plaintiff, but has yet to certify a class of plaintiffs. All Defendants have now moved to dismiss the complaint pursuant to Rule 12(b)(6).

## I.

Plaintiff charges an intricate scheme to wrongfully market living trusts, annuities, and other securities. Because Plaintiff's complaint details a lengthy pattern, the facts in this case are best described in four phases: (1) the sale of the living trusts, (2) the transfer of Plaintiff's stocks to a new broker, (3) Plaintiff's decision to purchase two annuity contracts, and (4) Plaintiff's decisions to transfer her remaining assets to new brokerage firms and sell two life insurance policies. However, the Court's analysis of Plaintiff's claims solely concerns the sale of annuity contracts.

In 1999, Defendant Victor E. Tackett, a practicing attorney admitted to the Kentucky bar mailed out to senior citizens, a letter advertisement entitled "How to Avoid Probate" which discussed the advantages of forming a living trust. Defendant Joel Miller is an employee of Defendant ALMS, serves as a client service representative for Tackett, and is a registered agent for Defendant American Equity. After Plaintiff responded to one of Tackett's advertisements, Miller, acting on behalf of Tackett, met the Plaintiff and her husband at their home. During that meeting, Miller counseled the couple to purchase a living trust and collected detailed financial information. Based on Defendants' advice, Plaintiff paid Tackett $1995.00 to set up and administer her living trust. Following this sale, Plaintiff received a package of materials labeled from the "Law Office of Victor E. Tackett, Jr."

Next, Plaintiff's Complaint alleges that, "in furtherance of Defendants' scheme and course of conduct," Defendant Terry J. Ciotti met with the Plaintiff on multiple occasions. Ciotti is licensed under the Kentucky Department of Insurance to sell

[1] In addition to the relatively narrow circumstances supporting the two federal securities claims discussed here, Plaintiff has also alleged a broader scope of actions which support eight pendant state law claims. The Court retains these under its supplemental jurisdiction. The state law claims are: intentional misrepresentation, negligent misrepresentation, common law fraud, breach of contract, breach of good faith and fair dealing, breach of fiduciary duty, violation of the Kentucky Deceptive Acts and Practices Law, and unjust enrichment and imposition of a constructive trust.

[2] The Defendants in this case are: Addison Insurance Marketing, Inc., ALMS Holdings, Inc., ALMS Ltd. L.L.P., American Equity Investment Life Insurance Company, Financial West Investment Group, Sentra Securities, Williams Financial Group, Terry J. Ciotti, Michael P. McIntyre, Joel L. Miller, Sidney Mondschein, David J. Noble, Victor E. Tackett, Jr., Douglas J. Van Meter.

life insurance and has been an agent for American Equity, Addison insurance Marketing, Inc., and Midland Life Insurance Company. At the first meeting, Ciotti reviewed a Tackett brochure and circled the advantages of a living trust. In the course of her meetings with Ciotti and Miller, Plaintiff says she was falsely misled into believing a living trust was in her best financial interest when, in fact, it proved to be financially devastating. Ciotti delivered the trust documents to Plaintiff around early October of 1999.

In the second phase of the scheme, Plaintiff's complaint alleges that Ciotti advised Plaintiff to transfer her stock portfolio to Defendant Sidney Mondschein "who could do a better job managing the portfolio." At the time, Mondschein was a broker employed by the Defendant security brokerage firms Financial West Group, Sentra Securities, and Williams Financial. While at Plaintiff's home, Ciotti called Mondschein who spoke with the Plaintiff and assured her he would take good care of her assets. On the advice of Ciotti and believing him to be a representative of Tackett, Plaintiff's complaint states that she "signed other documents allowing Ciotti to 'sweep' her investment account and all of its assets."

Plaintiff claims that Ciotti then pressured her "into surrendering an equitable annuity and placing money from that annuity in Ciotti's control." Additionally, she alleges that Defendants engaged in "churning" whereby they bought and sold in rapid succession dividends from her existing life insurance policies or annuities to purchase replacement policies. Defendants explained that these new polices provided greater death benefits, cash values and surrender values although they charged her exorbitant commissions and other administrative charges, costing Plaintiff thousands of dollars.

In phase three, Plaintiff alleges that Ciotti, acting as a licensed agent of American Equity, helped Plaintiff purchase two annuities from American Equity. Plaintiff purchased the first annuity contract, dated September 23, 1999, for a lump sum premium of $64,214.32. She designated her children as the intended beneficiaries of this annuity. On October 27, 1999, Plaintiff purchased her second annuity contract for a lump sum premium of $216,289.53.[3] The intended beneficiary of this second annuity was "The Dr. Harold G. Malone and Beverly S. Malone Revocable Living Trust." It is these two annuities which Plaintiff claims are securities and which, therefore, become the focus of the motion to dismiss.

According to the annuity contract, Plaintiff purchased an American Equity product known as "The Ultimate Equity Index." The contracts state that the Ultimate Equity Index is a single-premium deferred annuity. In effect, the Index operated as an insurance plan with an investment aspect through which Plaintiff purchased a contract backed by American Equity. Under the contract terms, American Equity guaranteed Plaintiff a minimum return of 100 percent of her premium plus *at least* 3 percent interest annually, depending on how the S & P 500 Index fared. Specifically, American Equity agreed to pay Plaintiff an annual interest credit based on a formula tied to the performance of the S & P 500 Index during the contract year. American Equity promised Plaintiff she would always get at least a 3 percent return annually and was guaranteed more if the S & P 500 Index produced a higher rate of return. This amounted to a guar-

---

**3.** Although in Exhibit N, Plaintiff attaches one page of one annuity contract, the contracts in their entirety were provided as Exhibits A and B with Defendant American Equity's Motion to Dismiss. Plaintiff has raised no objections as to the authenticity of these contracts, therefore the Court has considered them throughout this opinion.

antee of 134 percent of her premium at the end of her ten-year contract term.

In phase four, the complaint alleges that the remains of Plaintiff's assets went in two directions. First, on the advice of Ciotti and other unspecified Defendants, Plaintiff transferred the remainder of her money to Financial West, a California brokerage firm which employed Mondschein. Thereafter, Mondschein advised Plaintiff to move her account to two additional brokerage houses, Sentra and Williams Financial. Second, Plaintiff alleges that in furtherance of Defendants' scheme, Defendant Van Meter, Defendant ALMs, and the other Defendants advised Plaintiff and her husband to cash in two life insurance policies. The life insurance policies had a face value of $100,000, but a cash out value of less than $10,000. Plaintiff followed this advice.

In all, Plaintiff's complaint asserts two federal causes of action and eight state law claims. The first count, asserted against twelve of the defendants,[4] alleges that Defendants violated Section 10(b) of the Securities and Exchange Act and Rule 10b–5 by making false and misleading representations of material facts both in person and through instrumentalities of interstate commerce. The second count alleges that Noble, McIntyre, and Tackett violated Section 20(a) of the Exchange Act by serving as "controlling persons" of the Defendant corporations.

## II.

On a motion pursuant to Rule 12(b)(6), dismissal of the complaint is proper only if it is clear that the plaintiff can prove no set of facts in support of her claim which would entitle her to relief. *See Mayer v. Mylod,* 988 F.2d 635, 638 (6th Cir.1993). Counts I and II of Plaintiff's Complaint are grounded in the Securities and Exchange Act of 1934. The threshold question in any action brought pursuant to the Securities Acts is whether a "security" exists. *Union Planters Nat'l Bank of Memphis v. Commercial Credit Bus. Loans, Inc.,* 651 F.2d 1174, 1179 (6th Cir.1981). To meet this threshold, Plaintiff claims that the annuity contracts she purchased from American Equity were securities.[5] This case therefore requires the

4. Plaintiff charges the following defendants with violating Count I of her complaint: Addison Insurance Marketing, Inc., ALMS Holdings, Inc., ALMS Ltd. L.L.P., American Equity Investment Life Insurance Company, Financial West Investment Group, Sentra Securities, Williams Financial Group, Terry J. Ciotti, Joel L. Miller, Sidney Mondschein, Victor E. Tackett, Jr., and Douglas J. Van Meter.

5. In her reply brief, Plaintiff also conclusively states that the issue of whether annuities constitute securities does not need to be analyzed because "Plaintiff has alleged that the stocks she sold at Defendants' urging in order to finance her purchases of Defendants' annuity contracts and other securities are obviously securities invoking the Exchange Act." In her complaint, however, plaintiff only makes mention of these other stocks on two occasions, neither of which are sufficient to allege a violation of the Exchange Act. First, she alleges that, under pressure from Ciotti, she allowed Mondschein to assume control of her portfolio. Second, she alleges that, under advice from Tackett, she "signed other documents allowing Ciotti to 'sweep' her investment account and all of its assets, which Ciotti promptly did in furtherance of Defendants' scheme and course of conduct in his capacity as Defendant Tackett's estate planning representative."

Neither of these overly conclusive allegations can form the basis for a claim under the Exchange Act. In both cases, the fraud alleged did not involve the sale or purchase of a security, but rather the management of a portfolio. *See Klorer v. Bennett,* 1990 WL 94241, 1990 U.S.App. LEXIS 11591, *19 (6th Cir.1990) (noting that "Section 10(b)'s fundamental purpose is to assure that full information is available to decision makers in security transactions" thus protection "of those who have entrusted the decision making to others is a concern of state law, for which a cause of action under § 10(b) should not be inferred").

Court to decide whether a fixed indexed deferred annuity is a "security" within the meaning of the 1934 Act. Neither side has identified any disputed material fact which might prevent the Court from resolving this discreet issue.

The text of the 1934 Act coupled with the SEC's Safe Harbor provision provide the Court with two guideposts in making this determination. First, the Court must determine whether those annuity contracts constitute a "security" within the meaning of Section 3(a)(10) of the Securities Exchange Act, 15 U.S.C. § 78C(a)(10). Second, if the annuities are potentially a "security," the Court must analyze whether the Safe Harbor of Rule 10b–5 exempts certain types of annuity contracts from the provisions of the federal securities laws.

## A.

■ The boundaries for determining whether an annuity contract constitutes a security within the meaning of Section 3(a)(10) are controlled by two points of law. First, Section 3(a)(8) of the Securities Act exempts from its provisions "[a]ny insurance or endowment policy *or annuity contract* or optional contract issued by a corporation subject to supervision of the appropriate insurance regulatory of any state." 15 U.S.C. § 77c(a)(8) (emphasis added). Second, however, in interpreting the definition of "security" within Section 3(a)(10), the Supreme Court has distinguished among different classes of annuities based on the characteristics that make them operate like securities and has classi-

fied "variable annuities" as securities, thus cutting back on Section 3(a)(8)'s sweeping exclusion. *SEC v. Variable Annuity Life Insur. Co. ("VALIC")*, 359 U.S. 65, 71–72, 79 S.Ct. 618, 3 L.Ed.2d 640 (1959). The Court's inquiry therefore starts by determining whether the contract here operates more like a variable or fixed annuity.

In making its determination, the Court has carefully considered the general principles set out by the Supreme Court. As Plaintiff correctly notes, the definition of the statutory term "security" embodies "a flexible rather than static principle, one that is capable of adaptation to meet the countless and variable scheme devised by those who seek the use of the money of others on the promise of profits." *SEC v. W.J. Howey*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). In addition, the Supreme Court has said that, in searching for content in the term "security," "form should be disregarded for substance and the emphasis should be on economic reality." *Tcherepnin v. Knight*, 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967). In short, though Defendants have attempted to take the easiest analytical approach, the Court cannot dispositively classify this annuity as "fixed" and thus exempt it from the reach of the Securities Act, simply because the contract itself labels it so.

The modern day differences between fixed and variable annuities are not always immediately apparent in the context of indexed deferred annuities, such as this one, where the purchaser is guaranteed a fixed payment at a later date subject to an increase based on a stock index.[6] Each

---

If anything, Plaintiff's Complaint indicates that she transferred all authority to make investments to Mondschein and Ciotti; Plaintiff herself made no investment decisions. Therefore she was not the actual purchaser or seller of securities and can not bring an action against "Defendants" for these transactions because her claim is not covered by the Exchange Act.

6. On multiple occasions the Supreme Court has noted that the differences between the two traditional forms of annuities are often overshadowed by their similarities. *See S.E.C. v. VALIC*, 359 U.S. 65, 79 S.Ct. 618, 3 L.Ed.2d 640 (1959) ("In some respects the variable annuity has the characteristics of the fixed and conventional annuity: payments are made periodically; they continue until the annuitant's death or in case other options are chosen, until the end of a fixed term ...

analysis in this area therefore requires the Court's particular attention to the instrument at issue. The Court begins by discussing the relevant characteristics of fixed and variable annuities and then classifies the contract on the basis of the criteria applied by the Supreme Court and other circuits.

The Supreme Court provided the leading discussion on this subject in a pair of cases that distinguished between variable and fixed annuities. *VALIC*, 359 U.S. at 69–70, 79 S.Ct. 618; *SEC v. United Benefit Life Ins. Co.*, 387 U.S. 202, 207–08, 87 S.Ct. 1557, 18 L.Ed.2d 673 (1967). In *VALIC*, the Supreme Court explained that a chief characteristic of a variable annuity was the direct correlation between investments and pay outs to the annuitant. The Court explained that, in a variable annuity, "benefit payments vary with the success of the investment policy." 359 U.S. at 69, 79 S.Ct. 618. A variable annuitant thus assumes a much greater risk than the holder of a fixed annuity who is provided with a guarantee. "The holder of a variable annuity cannot look forward to a fixed monthly or yearly amount ... [i]t may be greater or less depending on the wisdom of the investment policy." *Id.* at 70, 79 S.Ct. 618. It was this risk-bearing feature of the variable annuity that the Court found most persuasive in its decision to classify the annuity at issue as one covered by federal security laws. "In hard reality the issuer of a variable annuity that has no element of a fixed return assumes no true risk in the insurance sense." *Id.* at 71, 79 S.Ct. 618. In contrast, the Court concluded, the risk would at the very least be shared in a fixed annuity where there was a "guarantee that at least some fraction of the benefits will be payable in fixed amounts." *Id.* at 72, 79 S.Ct. 618.

Several years later, in *United Benefit*, 387 U.S. at 209, 87 S.Ct. 1557, the Court clarified its *VALIC* opinion, holding that the legal analysis of whether a deferred annuity constituted a security should proceed in two parts if there was direct investment of the principal during the accumulation phase coupled with a minimum guaranteed payout at the end of the contract term.[7] The Court held that, during the accumulation stage, the annuity in its case fell within the purview of the Exchange Act because the investor bore the burden. *Id.* at 208, 87 S.Ct. 1557. Central to the Court's analysis was the fact that the insurer merely promised to serve as an investment agency and did not promise the policyholder a fixed amount of his savings plus interests. *Id.* The policyholder was thus only guaranteed either his share of the total fund into which his payments were invested, or a cash value measured

---

payments are made both from principal and income; and the amounts vary according to the age and sex of the annuitant"); *Nations-Bank of North Carolina v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 264, 115 S.Ct. 810, 130 L.Ed.2d 740 (1995) (upholding the decision of the Comptroller of Currency under the *Chevron* doctrine to classify all annuities, both fixed and variable, as investments rather than insurance because "though fixed annuities more closely resemble insurance than do variable annuities, fixed annuities too have significant investment features and are functionally similar to debt instruments").

**7.** In *United Benefit*, the "Flexible Fund Annuity" at issue was a deferred annuity policy

under which the policyholder agreed to pay United Benefit monthly premiums for a specified period which United Benefit then maintained in a separate account. *SEC v. United Benefit Life Ins. Co.*, 359 F.2d 619, 621 (D.C.Cir.1966). Importantly, United Benefit did *not* promise to accumulate net premiums at a specified rate of interest. Rather, the company promised that the annuitant would be credited with a proportionate share of the profits which resulted from the investment and reinvestment of that money in the Flexible Fund. At the end of the contract period, the investor was guaranteed 100 percent of their initial investment if the Fund was unprofitable.

by a percentage of his net premiums which only reached 100 percent after 10 years. *Id.*

The *United Benefit* Court contrasted the accumulation phase of the annuity in its case with a more conventional annuity. The Court explained, where there is a fixing of the benefits stipulated at the outset in a conventional annuity, the critical issue from an investment standpoint is the planning problem shouldered by the insurer who must make the financial decisions to backup its guarantee. *Id.* at 208, 87 S.Ct. 1557. Simply put, in a fixed annuity, "the policyholder has no direct interest in the fund and the insurer has a dollar target to meet." *Id.* Thus, the Court concluded, in a fixed annuity "the insurer is acting in a role similar to that of a savings institution, and state regulation is adjusted to this role." *Id.*

More recently, both the Second and the Seventh Circuits provided additional guidance in drawing the line between fixed and variable annuities. *Lander v. Hartford Life and Ins. Co.*, 251 F.3d 101 (2nd Cir. 2001) (holding that variable annuity contracts constituted "covered securities" as defined by the Securities Litigation Uniform Standards Act of 1998); *Otto v. Variable Annuity Life Ins. Co.*, 814 F.2d 1127, 1131 (7th Cir.1986), *cert. denied,* 486 U.S. 1026, 108 S.Ct. 2004, 100 L.Ed.2d 235 (1988) (affirming a grant of summary judgment where the annuity at issue was found to be an insurance product exempt from securities regulation). In *Lander,* the Second Circuit emphasized the extent to which the payout made by a variable annuity was entirely dependent on the success of the investment securities selected by the annuitant. 251 F.3d at 104–05. Similarly, in *Otto,* the Seventh Circuit found the insurance instrument at issue was clearly a fixed annuity because the company selling the product was required to pay a guaranteed rate of 4 percent interest on all fixed annuity contributions made during the first ten years of the contract. 814 F.2d at 1131–32.

■ Plaintiff's effort, therefore, to classify her American Equity contracts as the sale of a variable annuity fails for several reasons. First, Plaintiff's two contracts with American Equity *guaranteed* her a minimum 3 percent return, irrespective of the performance of the S & P 500 Index. As the Benefit Summary and Disclosure form states, the annuity contracts were "designed to accumulate value based on the average change in the S & P 500 Equity Index during each contract year, without risking loss of premium due to the S & P volatility." In other words, in the event the S & P 500 performed poorly, Plaintiff still received a 3 percent interest payment on top of her principal annually. Consequently, American Equity assumed the investment risk and not Plaintiff who received payment regardless of how poorly the market performed.

Second, Plaintiff's benefit payments from American Equity were not directly dependent on the performance of investments made with her money. That is to say, as a structural matter, Plaintiff's contract did not operate like a variable annuity: her payments were not a function of a personalized portfolio and her principal was not held in an independent account. Had Plaintiff participated in a variable annuity, she would have retained control over the investment of her account. In this case, Plaintiff paid American Equity lump sum premiums in the amount of $216,289.53 and $64,214.32 and signed a contract that guaranteed her a 3 percent return or more if the S & P 500 Index faired well. Moreover, at no point does Plaintiff's complaint allege that her premiums were maintained in separate accounts or that, for some reason, they should have been—the keystone characteristic of all variable annuity contracts. *See* Invest-

ment Company Act of 1940, 15 U.S.C. § 80a–1 (requiring that all variable annuity policies must be registered with the SEC as investment companies).

Finally, Plaintiff focuses on the fact that her return over and above the guarantee depended on the performance of the S & P 500 Index. In that way, her annuity contract did involve an element of risk and uncertainty. However, this argument is not conclusive for Plaintiff in these circumstances. Defendants actually bore as much or more of the risk than Plaintiff. American Equity guaranteed Plaintiff at least three percent of the return or the S & P 500 Index based on whichever was greater. If American Equity was unable to surpass this indexed rate in its own investment of the Plaintiff's premium, then it was the loser. More importantly, Plaintiff's risk was not that she would lose the value of her initial investment, but rather the risk that had she chosen a different contract her money might have been worth more than 134 percent at the end of the ten-year contract period. That type of risk—that she could have gotten a better deal but for the pressure she encountered to enter into this particular contract—is not the type of risk central to determining whether a security exists. *See VALIC*, 359 U.S. at 71, 79 S.Ct. 618 (noting that "it is no answer to say that the risk of declining returns in times of depression is the reciprocal of the fixed-dollar annuitant's risk of loss of purchasing power when prices are high and gain of purchasing power when they are low"). Because the Defendants assumed a much greater risk, Plaintiff's Investment seems a lot more like insurance and less like an investment for the Plaintiff. *Id.*

For all these reasons, the Court finds Plaintiff's American Equity contracts are more like "fixed annuities" and therefore are excluded from the definition of "security" under the Supreme Court's opinions in *VALIC* and *United Benefit.*

**B.**

The Court could end its inquiry here. However, the Security and Exchange Commission Rule 151 Safe Harbor, 17 C.F.R. § 230.151, also merits discussion because it guarantees certain types of annuities an exemption from federal securities law. *See* Securities Act Release 33–6658 (Sept. 17, 1986) (noting that a contract which satisfies Rule 151 will be excluded from all provisions of the Securities Act). Subsection (a) of Rule 151 provides:

> Any annuity contract or optional annuity contract (a contract) shall be deemed to be within the provisions of section 3(a)(8) of the Securities Act of 1933 (15 U.S.C. 77c(a)(8)), Provided,
>
> (1) The annuity or optional annuity contract is issued by a corporation (the insurer) subject to the supervision of the insurance commissioner, bank commissioner, or any agency or officer performing like functions, of any State or Territory of the United States or the District of Columbia;
>
> (2) The insurer assumes the investment risk under the contract as prescribed in paragraph (b) of this section; and
>
> (3) The Contract is not marketed primarily as an investment

17 C.F.R. § 230.151(a).[8]

■ The Court concludes that the three-prong test provided by the Rule 151

---

8. On August 20, 1997, the SEC requested comments on the status of equity index annuities such as the one at issue in this case. *Equity Index Insurance Products,* SEC Release No. 33–7438, 1997 WL 473102, 1997 SEC LEXIS 1691, at *5 (Aug. 20, 1997). The SEC explained:

> Equity index insurance products combine features of traditional insurance products (guaranteed minimum return and tradition-

Safe Harbor further shows that the American Equity contract is a non-security. Because all parties appear to concede the existence of the first prong,[9] the Court will focus its discussion on the remaining parts of the test in dispute.

The second prong of the Safe Harbor test requires that the "insurer assumes the investment risk under the contract" and then sets out three criteria, all of which the American Equity annuities meet in this case. 17 C.F.R. § 230.151(b).[10] Under the first criteria, American Equity assumes the investment risk if "the value of the contract does not vary according to the investment experience of a separate account." *Id.* Nothing in Plaintiff's complaint suggests that the value of her annuity varies with the result of a separate account maintained by American Equity. To the contrary, as noted in the American Equity brochure attached to the Complaint, American Equity did not invest Plaintiff's money, but rather attempted to ensure the safety of it by maintaining a portfolio comprised of investment grade bonds, cash and cash equivalents. [See Plaintiff's Complaint Exh. H.] In other words, the value of Plaintiff's contract was *not* dependant on a separate account maintained by American Equity. Her funds were instead commingled with other American Equity Funds and any return over the three percent guarantee fluctuated based on the S & P 500 Index. Plaintiff thus did not pay American Equity to invest her premium, but rather purchased an insurance plan. Because it is clear Plaintiff's money was not maintained under a separate account and Plaintiff provides no argument to the contrary, subsection(b)(1) is satisfied. *Berent v. Kemper Corp.*, 780 F.Supp. 431, 442 (E.D.Mich. 1991), *aff'd* 973 F.2d 1291 (6th Cir.1992).

al securities (return linked to equity markets). Depending on the mix of features in any insurance product, including an equity index insurance product, the product may or may not be entitled to exemption under the Securities Act as an "insurance policy" or "annuity contract." To date, most equity index annuities have not been registered under the Securities Act, although commentators have acknowledged that substantial uncertainty exists whether all of these products are entitled to exemption from registration.

The SEC has made no further comment on the status of this request. The Court merely notes this request for comment as evidence that, though the issue remains unsolved, the presumption remains that Rule 151 applies to annuities such as the one in this case. In any event, Plaintiff does not contest the applicability of the Rule 151 test in this case, but rather focuses on refuting the application of the test put forth by the Defendants.

9. The first prong of the Rule 151 test requires that:

The annuity or optional annuity contract is issued by a corporation (the insurer) subject to the supervision of the insurance commissioner, bank commission, or any agency or officer performing like functions, of any State or Territory of the United States or District of Columbia

Plaintiff implicitly acknowledged the existence of this oversight when her son filed a compliant with Kentucky Department of Insurance and an investigation was opened.

10. An insurer is deemed to assume the investment risk under the contract pursuant to Rule 151(a)(2) if:

(1) The value of the contract does not vary according to the investment experience of a separate account;

(2) The insurer for the life of the contract (i) Guarantees the principal amount of the purchase payments and interest credited thereto, less any deduction (without regard to its timing) for sales administrative or other expenses or charges; and

(ii) Credits a specified rate of interest (as defined in paragraph (c) of this section) to net purchase payments and interest credited thereto; and

(3) The insurer guarantees that the rate of any interest to be credited in excess of that described in paragraph (b)(2)(ii) of this section will not be modified more frequently than once per year.

17 C.F.R. § 230.151(b).

Subsection (b)(2) of the investment risk prong is also satisfied. American Equity guaranteed the Plaintiff the principal amount of the purchase payments and interests, less deductions for sales, administrative, and other expenses. The contracts provided a minimum guaranteed contract value of 100 percent of the single premium plus 3 percent interest. [See p. 1 of both Exhs. A and B of Defendant American Equity's Appendix.] That one of Plaintiff's contracts, generated only 1 percent income because of a poor performance by the S & P 500 Index does not change the analysis. Plaintiff's account was nevertheless credited 3 percent for that year. [See Plaintiff's Complaint Exh. O.] Plaintiff argues that the 134 percent guarantee only applies if the annuitant holds the policy for a minimum of ten years. This is evidence, she argues, of a guarantee under only certain conditions. But Plaintiff misses the point. This feature of her contract is not connected with the extent to which she shouldered the risk of investment, but rather is related to the deferral aspect which is entirely independent of the fixed/variable analysis. Additionally, the fact that Plaintiff was entitled to retain her premium at any point during the life of the contract further disproves her claim that she assumed a significant investment risk.

The last Rule 151 investment risk criterion is that any interest credited in excess of the guaranteed minimum must not be modified more frequently than once per year. The contracts provide that the initial "Participation Rate" (the rate of excess interest credited) is guaranteed for the first year, and then may change only annually. [See Defendant American Equity's Exhs. A and B], thus satisfying this criterion.

Finally, the third prong of Rule 151 requirement requires that the policies not be marketed primarily as investments. Plaintiff is correct in noting that the American Equity brochure and contract made reference to the success of the American Equity portfolio and that it advertised the S & P 500 indexing feature. However, making reference to investments in the context of assuring the security of an annuitant's premium, and an aggressive marketing strategy related to the potential for growing that premium have distinct legal significance. For instance, in *United Benefit*, the Supreme Court cited United Benefit's reliance on the possibility of investment return as evidence of an "appeal to the purchaser not on the usual basis of *stability and security* but on the prospect of 'growth' through sound investment management." 387 U.S. at 211, 87 S.Ct. 1557 (emphasis added). In contrast, in *Otto*, the Seventh Circuit concluded, "Although the award of discretionary excess interest and VALIC's investment experience were given some emphasis, the fixed annuity ... was marketed primarily on the basis of its stability and security." 814 F.2d at 1134. Thus this Court must determine, based on Plaintiff's Complaint, if it appears the marketing emphasis was clearly more correlated to the prospect growth in lieu of stability.

American Equity's brochure, though it mentions the company's "sound financial management," does so in the context of explaining that the company promises "stability and flexibility." [See Plaintiff's Complaint, Exh. H]. In addition, the contract itself states plainly just before Plaintiff's signature, "[I] understand that past S & P 500 Index activity is not intended to predict future activity and that the S & P 500 Index does not include dividends." [See Defendant American Equity's Exhs. A and B]. Moreover, the one-page summary Plaintiff signed, which focused on how her Contract Value was calculated at any one point to assure her the initial principal plus interest, did not emphasize the potential increase in her assets, but

focused on explaining to her that she was guaranteed her principal plus three percent interest. In totality, the Court finds Plaintiff's allegation that "Defendant caused Plaintiff" to purchase the two annuities coupled with the terms provided in the contracts for those annuities does not demonstrate that the policy was "marketed" as an investment. Thus, the Court must conclude that the American Equity annuities are protected by the Rule 151 Safe Harbor.

### III.

In sum, because the American Equity annuities at issue are exempt from federal securities laws both under Section 3(a)(8) and Rule 151, there is no legal basis for Plaintiff's complaints under the Securities and Exchange Act of 1934. Counts I and II of Plaintiff's complaint are dismissed.

Because the Court finds there is no viable federal claim in this action on which to predicate supplemental jurisdiction, the Court will exercise its discretion to dismiss supplemental state law claims pursuant to pursuant to 28 U.S.C. § 1367(c)(3). *See United Mine Workers of America v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *see also Musson Theatrical, Inc. v. Federal Express Corp.,* 89 F.3d 1244, 1255 (6th Cir.1996). Counts III–X are therefore dismissed without prejudice.

The Court will enter an order consistent with this Memorandum Opinion.

### ORDER

The Court has considered Defendants' motion to dismiss. Being otherwise sufficiently advised,

IT IS HEREBY ORDERED that Defendants' motions to dismiss are SUSTAINED and the Court DISMISSES WITH PREJUDICE Counts I and II.

IT IS FURTHER ORDERED that the Court DISMISSES WITHOUT PREJU-DICE Counts III, IV, V, VI, VII, VIII, IX, and X.

This is a final and appealable order.